[No. C058020. Third Dist. Mar. 6, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
CHUE VANG, Defendant and Appellant.

## COUNSEL

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, Catherine Chatman and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, J.**—An information accused defendant Chue Vang of violating Penal Code section 288, subdivision (b)(1)[1] (lewd and lascivious acts with a child under 14, accomplished by force, duress, or menace), on or about and between April 15, 2003, and December 31, 2004; the alleged victim was his niece A., aged six at the time of the offense. After trial, a jury convicted defendant of this offense. The trial court sentenced defendant to a state prison term of six years (the middle term).

Defendant contends: (1) The trial court denied defendant his rights to due process, fundamental fairness, and confrontation under the federal and state Constitutions when it found A. competent to testify. (2) The trial court deprived defendant of due process and a fair trial under the federal and state Constitutions by giving the jury the standard instruction on witness credibility (CALCRIM No. 226) and refusing defendant's proposed modification, which would have told the jury that it could reject A.'s account if she testified inaccurately even though she did not deliberately lie. (3) The trial court deprived defendant of due process, a fair trial, and the right to present a defense when it refused to allow defendant's medical expert to testify that A.'s 11-year-old brother was physiologically capable of raping her. (4) Cumulative error compels reversal.

In the published portion of the opinion, we conclude the trial court properly refused defendant's proposed modification of CALCRIM No. 226.

---

[1] Undesignated section references are to the Penal Code.

In the unpublished portion, we reject defendant's other contentions of error. We shall therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution case*

In 2003 and 2004, defendant and A. lived with the rest of their extended family in a three-bedroom house on Cedar Springs Way in Sacramento. The household also included A.'s father, L.V., her mother, N.L., her grandparents, her six siblings, and her other two uncles. Defendant slept either in the attached garage or in a trailer parked in the front yard. According to A., she slept in her parents' or grandparents' bedroom or in the living room on a sofa; other children in the family also usually slept in the living room on a sofa or on the floor. When she slept in her grandparents' bedroom, she shared a bed with her older brother J.

J., 13 years old at the time of trial, generally confirmed A.'s account of the sleeping arrangements in the house, but denied ever sharing a bed with A.; according to him, she shared a bed only with their younger brothers. J. had never seen defendant in the living room while the children were sleeping there, but J. was a heavy sleeper.

On October 28, 2003, A. and her mother visited Dr. Pira Rochanayon, a family practitioner untrained in sexual assault examinations, because A. had experienced vaginal bleeding for three weeks. They told him that A. had fallen from a bicycle. Examining her vaginal area by sight and touch alone, Dr. Rochanayon could not detect a hymen; however, she denied sexual abuse, and he did not report it.

A., who was nine years old at the time of trial, testified that she had had a bicycle accident before her molestation which caused vaginal injury and bleeding, but it was not nearly so painful as what defendant did to her. After falling asleep on the living room sofa one night, A. awoke to find defendant on the sofa behind her, as her brothers and sisters in the room continued to sleep soundly. Although it was fairly dark, she could see defendant's face during his assault; she also smelled him.[2] She tried to scream, but he put his hand over her mouth. Having taken off his pants, he forced her pants and underpants down to her knees with his other hand. Then he put his "private part" inside A.'s private part twice; the second time, he moved his body as he did so. She described the act as "rape," a word she had heard from other children at school. She could not escape because he had pinned her in place

---

[2] According to A., defendant smelled different from and worse than her other uncles.

with his leg. She was finally able to make a "screeching noise," after which defendant stopped, put on his pants, and left, heading toward the garage.

The next morning and for several days afterward, A. experienced vaginal pain and bleeding. Seeing blood in her underpants before showering, she showed them to her parents and told them what had happened, even though she felt afraid to do so and afraid of defendant in particular. After this incident, A. saw Dr. Rochanayon, but did not tell him about the rape.[3]

In May 2005, A.'s mother told the police about A.'s alleged rape.[4]

On June 9, 2005, when A. was seven years old, Melanie Edwards of the Sacramento County MDIC (Multi-Disciplinary Interview Center) interviewed her with the aid of a Hmong interpreter.[5] The videotape of the interview was played for the jury, which received a transcript. According to the transcript, A. said that her uncle raped her once and gave an account similar to her trial testimony.[6] She also said that she knew the difference between the truth and a lie and that it was bad to lie.

Cathy Boyle, a pediatric nurse practitioner at UC Davis Medical Center who has examined over 5,500 children in cases of suspected sexual assault and has testified as an expert witness around 390 times in Sacramento County, examined A. on June 10, 2005. (She received A.'s history after it had been taken by a social worker, but did not rely on it in forming her opinion.) A. had very little hymen, and none at all from the 5:00 to the 7:00 position. This was an abnormal finding for a child of her age. On a classification scale from one (normal) to seven (sexually transmitted disease), Boyle rated this case a five (healed hymeneal trauma). She could not date the injury because even injuries as significant as this heal within three weeks. However, it was consistent with forcible sexual molestation and with penetration by a large object.[7] It could have been caused by either a single

---

[3] At no time in her testimony did A. give dates for these events.

[4] According to A.'s mother, A. finally told her about the alleged rape only after A.'s mother had asked her persistently for a week.

[5] A. testified without an interpreter at trial.

[6] Some of the details of her story were confusing or apparently self-contradictory, however. For instance, she said that when she woke up the light was on, but later she said that nobody could see what was happening because it was night; she also said she knew it was her uncle because he wears glasses. She said that she was sleeping on her back, but her uncle began his assault by getting on her back. She said she saw blood in her underwear before her uncle raped her; in response to the question whether breakfast comes before or after lunch, she said, "After lunch." The interviewer ultimately used anatomically correct dolls to facilitate the questioning.

[7] Boyle also found an external rash in A.'s genital area, which was not caused by a sexually transmitted disease. Boyle opined that because A. lacked hymeneal tissue, urine would leak into her underwear and the wet underwear would ultimately cause a skin irritation.

penetrating act or multiple penetrating acts. It could not have been caused by an injury from a bicycle accident. The only other scenario capable of producing such damage would be childbirth.

### Defense case

On the theory that defendant was being scapegoated for someone else's conduct, the defense called A.'s mother, N.L., to show that she had a grudge against defendant. Asked whether defendant had accused her of improperly receiving government funds, N.L. did not confirm or deny it, but said she had not done so. She admitted that she had been angry because he used the house's electricity for his trailer without paying for it.

The defense called A.'s father, L.V., to corroborate that N.L. had been angry about the electricity. L.V. also testified that defendant had spanked the children and A. had complained about it.

Sacramento Police Officer Paul Jacobs, who interviewed A. about the alleged molestation on May 29, 2005, in L.V.'s presence, testified that he ended the interview after 10 minutes because A. did not seem forthcoming or able to recall events independently of what L.V. had said about them.

Dr. James Crawford, medical director of the Center for Child Protection at Children's Hospital in Oakland, California, having reviewed the records in A.'s case, agreed with Cathy Boyle that A. had been sexually assaulted but disagreed that her injuries could have resulted from a single incident.[8] He could not say what minimum number of incidents would have been needed, but he had never seen this degree of trauma produced by a single incident and most children with such injuries report multiple incidents.

In closing argument, defense counsel asserted that the jury should refuse to credit A.'s testimony, which was "a mess."[9] Counsel argued that A.'s parents had coerced or manipulated her into accusing defendant because they bore grudges against him and sought to protect the real molester, J.

## DISCUSSION

### I[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[8] He also opined that A.'s external rash could not have been caused by leaking urine.

[9] In so arguing, counsel quoted some of the testimony we set out below in part I of the discussion.

[*]See footnote, *ante*, page 1120.

## II

Defendant contends the trial court erred prejudicially by refusing his request to modify the standard instruction on witnesses' credibility. This contention lacks merit.

*Background*

The trial court proposed to give Judicial Council of California Criminal Jury Instructions CALCRIM No. 226 as follows:

"You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. The testimony of each witness must be judged by the same standard. You must set aside any bias or prejudice you may have, including any based on the witness's gender, race, religion, or national origin.[10] You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

"In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:

"How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

"How well was the witness able to remember and describe what happened?

"What was the witness's behavior while testifying?

"Did the witness understand the questions and answer them directly?

"Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

"What was the witness's attitude about the case or about testifying?

"Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

---

[10] The current version of this instruction omits the reference to specific biases or prejudices, reading simply: "You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have." (CALCRIM No. 226 (2008).)

"How reasonable is the testimony when you consider all the other evidence in the case?

"Did other evidence prove or disprove any fact about which the witness testified?

"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently.

"If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject.

"*If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest.*" (Italics added.)

At the instructions conference, defense counsel requested the last paragraph be modified to read: "If you decide that a witness deliberately lied *or inaccurately testified* about something significant in this case[,] you should consider not believing anything that witness says. Or[,] if you think the witness lied *or inaccurately testified* about some things[,] but told the truth about others, you may simply accept the part that you think is true and ignore the rest." (Italics added.) As authority for this modification (said to derive from Lundy, Forecite California (2009)), counsel alluded to federal cases but did not cite any.[11]

After the prosecutor objected, the trial court refused the proposed modification, ruling that it clashed with the original paragraph's emphasis on deliberate lying and that the rest of CALCRIM No. 226 sufficiently covered other kinds of inaccuracies. The court thereafter gave the jury CALCRIM No. 226 unmodified.

*Analysis*

Defendant contends that CALCRIM No. 226 as given did not fully and fairly inform the jury of his theory of the case: that A.'s testimony was

---

[11] Appellate counsel also does not cite the purported federal authority for this modification of the instruction.

incredible, not because she was deliberately lying but because "she did not fully understand the proceedings . . . or what it meant to tell the truth or tell a lie" or because she was "coached to tell a lie about [defendant]."[12] We are not persuaded.

In reviewing claims of instructional error, we look to whether the defendant has shown a reasonable likelihood that the jury, considering the instruction complained of in the context of the instructions as a whole and not in isolation, understood that instruction in a manner that violated his constitutional rights. (*People v. Smithey* (1999) 20 Cal.4th 936, 963 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218]; *People v. Andrade* (2000) 85 Cal.App.4th 579, 585 [102 Cal.Rptr.2d 254].) We interpret the instructions so as to support the judgment if they are reasonably susceptible to such interpretation, and we presume jurors can understand and correlate all instructions given. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148 [40 Cal.Rptr.3d 118, 129 P.3d 321]; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1112 [93 Cal.Rptr.2d 433].)

In essence, defendant contends that the last paragraph of CALCRIM No. 226 should be modified as proposed here whenever there is evidence that a witness might have testified inaccurately for reasons other than mendacity or bad faith. This appears to raise an issue of first impression.[13] However, the paragraph of the instruction at issue generally corresponds to CALJIC No. 2.21.2 (witness willfully false; cf. CALJIC No. 2.21.1) and its predecessor, CALJIC former No. 2.21, which have received ample judicial construction.[14] Therefore we turn to case law construing the CALJIC instructions for guidance.

---

[12] The second part of this argument misses the mark. If A. lied because she was "coached" to do so, she "deliberately lied," regardless of motive or influence. The instruction as given clearly covered that theory of the defense.

[13] *People v. Ibarra* (2007) 156 Cal.App.4th 1174 [67 Cal.Rptr.3d 871] and *People v. Anderson* (2007) 152 Cal.App.4th 919 [61 Cal.Rptr.3d 903] have upheld CALCRIM No. 226 against other challenges, as the People point out, but they do not address the point defendant raises now.

[14] CALJIC No. 2.21.2 reads as follows: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

Before 1988, CALJIC former No. 2.21 included this instruction along with the following instruction on discrepancies in testimony: "[D]iscrepancies in a witness's testimony or between [a witness's] testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience; and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to trivial detail should be considered in weighing its significance." The

■ It is well settled that CALJIC No. 2.21.2 (and its predecessor, CALJIC former No. 2.21) correctly state the law. (See, e.g., *People v. Carey* (2007) 41 Cal.4th 109, 130 [59 Cal.Rptr.3d 172, 158 P.3d 743]; *People v. Beardslee* (1991) 53 Cal.3d 68, 94 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People v. Turner, supra*, 50 Cal.3d 668, 698–699.)

The former instruction's purpose was to "set[] out a commonsense principle for evaluating witness credibility." (*People v. Murillo* (1996) 47 Cal.App.4th 1104, 1108 [55 Cal.Rptr.2d 21].) Specifically, it told jurors that "if they [found] that a witness willfully lied in one material part of his testimony . . . [t]hey [might] reject the whole testimony of such a witness, but they [were] not required to. They [might] nevertheless believe the remainder of the witness's testimony if they [found] the probability of truth favor[ed] his testimony in other particulars." (*People v. Reyes* (1987) 195 Cal.App.3d 957, 965 [240 Cal.Rptr. 752].)

The last paragraph of CALCRIM No. 226 serves the same purpose as CALJIC No. 2.21.2. Like the CALJIC instruction, it tells the jurors that if they find a witness lied about a material part of his testimony, they may, but need not, choose to disbelieve all of his testimony. Furthermore, if they find that though he willfully lied on one point he told the truth on others, his lie on the former point does not bar them from believing the rest. Thus, like CALJIC No. 2.21.2, the last paragraph of CALCRIM No. 226 aims specifically, and only, to address deliberate lying on the stand.

■ Defendant's proposed modification of CALCRIM No. 226 would have misstated the law. CALCRIM No. 226 allows the jury to disbelieve a witness who deliberately lies about something significant because experience has taught us that a deliberate liar cannot be trusted. The same is not true of a witness who is merely mistaken at some points in her testimony. Defendant cites no authority for the proposition that a witness's mere inadvertent inaccuracy on any significant point should prompt a jury to disbelieve her entire testimony, which is plainly at odds with the earlier portion of CALCRIM No. 226, and we know of no such authority. Indeed, it is hard to see how any jury could ever decide any case if it thought it could accept only the testimony of witnesses who had expressed no inaccuracies. This is particularly true of cases in which children are witnesses, because their use of language is not fully developed.

■ Furthermore, CALCRIM No. 226 addresses credibility questions other than deliberate lying in its earlier paragraphs, which generally correspond to two CALJIC instructions: Nos. 2.20 (believability of witnesses) and

---

1988 revision of CALJIC divided the substance of CALJIC former No. 2.21 into Nos. 2.21.1 and 2.21.2. (*People v. Turner* (1990) 50 Cal.3d 668, 698, fn. 15 [268 Cal.Rptr. 706, 789 P.2d 887].)

2.21.1 (discrepancies in testimony). As we shall explain, this portion of CALCRIM No. 226 sufficiently educated the jury on how to assess inaccuracies caused by anything other than mendacity.

Tracking CALJIC No. 2.20, CALCRIM No. 226 begins with a list of factors other than deliberate lying which the jury should consider in weighing the credibility of every witness, including the witness's capacity to perceive, remember, and describe events, his demeanor, his ability to understand and answer questions, his possible bias or prejudice (including that stemming from a personal relationship with someone involved in the case), his attitude about the case, any consistent or inconsistent past statements, and the reasonableness of his testimony in light of all the other evidence. Tracking CALJIC No. 2.21.1, CALCRIM No. 226 then warns the jury against rejecting testimony merely because of inconsistencies or conflicts because witnesses frequently and innocently forget things or remember them differently from each other. In total, then, CALCRIM No. 226—prior to its final paragraph about deliberate lying—covers every possible source of good faith inaccuracy in testimony and correctly informs the jury how to assess it.

 Contrary to defendant's view, therefore, his proposed modification was unnecessary to inform the jury how to weigh the possibility that A.'s testimony was inaccurate for any reason other than deliberate lying. The unmodified instruction plainly told the jury to consider whether A. could perceive, describe, and remember events correctly; whether she could clearly convey her version of events in response to questioning; whether her MDIC interview was inconsistent with her testimony; and whether her testimony was reasonable in light of all the other evidence. The instruction also alerted the jury to the possibility of improper influence from A.'s parents or anyone else personally involved in the case.

Thus, CALCRIM No. 226 as given fully covered the defense theory of the case. As we have indicated above, defense counsel's closing argument highlighted all of the relevant factors identified in the instruction. The instruction, together with counsel's argument, fully and fairly informed the jury as to defendant's theory of the case.

The trial court correctly refused defendant's proposed modification of CALCRIM No. 226.

### III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1120.

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Raye, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 13, 2009, S171815.