Filed 1/30/15  P. v. Campbell CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JERMAINE CAMPBELL et al.,<br><br>Defendants and Appellants. | C073456<br><br>(Super. Ct. No. 10F06759) |

Defendants Jermaine John Campbell and Jonathan Steven Hudson appeal from judgments following their murder convictions.  They raise instructional claims, a complaint that a sheriff's deputy sat near Campbell during his testimony, and a complaint that Campbell's mother was not allowed to speak at sentencing.  We shall affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendants were charged together with former codefendant Antoine Lee Taylor with the first degree murder and robbery of James Walker, a robbery-murder special circumstance, and various firearm enhancements.

1

The contentions raised on appeal do not require a lengthy discussion of the evidence heard at defendants' separate trials. It is enough to say that Campbell's and Hudson's juries each heard evidence that on the night of October 17-18, 2010, the duo robbed taxi driver James Walker; Campbell testified he shot Walker, who was found dead in his cab. We shall detail additional facts as relevant to defendants' claims in our discussion *post*.

Campbell's jury found him guilty of murder and robbery, sustained the robbery-murder special circumstance, and found he was armed with and personally discharged a firearm. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17), 211, 12022, subd. (a)(1), 12022.53, subd. (d).)[1] The trial court sentenced Campbell to life without parole plus 25 years to life, and Campbell timely appealed.

Hudson's jury found him guilty of murder and robbery, rejected the special circumstance, but found a principal was armed with a firearm. (§§ 187, subd. (a), 211, 12022, subd. (a)(1).) The trial court sentenced Hudson to 26 years to life, and Hudson timely appealed.

Taylor's jury found him not guilty on all counts.

## DISCUSSION

### I

### *Campbell's Claims*

A. *Self-Defense Instruction*

Campbell faults the trial court for including the "initial aggressor" limitation to the self-defense instructions, and contends this lowered the People's burden to prove defendant did not act in self defense. We disagree.

---

[1] Further undesignated statutory references are to the Penal Code.

The trial court instructed that if Campbell acted in self defense, he was not guilty of murder, and the People had to prove beyond a reasonable doubt that Campbell did *not* act in self defense. Over objection, the trial court added the following modified instruction (see CALCRIM No. 3471):

"A person who is the initial aggressor has the right to self-defense only if, one, he actually and in good faith tried to stop the assault or aggressive conduct, and, two, he indicates by words or conduct in a way that a reasonable person would understand, that he wanted to stop the aggressive conduct and that he stopped it."

Campbell contends this instruction is designed for cases of mutual combat or physical fighting, and has no application to all aggressive acts, with the result that it lessened the People's burden to disprove the defense theory of self defense by depriving him of the ability to argue that he had the right to stand his ground and not retreat. He claims this went to the "heart" of the defense because the "omitted element - his right to stand his ground - was critical, since he did not state that he tried to stop a fight (there was no fight to stop) or that he left the scene before firing. A reasonable jury might have relied on the erroneous instruction in finding that the prosecutor carried his burden on the self defense issue because appellant did not cease a fight or retreat. Because this issue was so central to the case, the trial court's error in giving the instruction was prejudicial." We disagree.

In California there is no duty to retreat from an assailant, instead: "The person attacked may 'stand his ground' and defend by deadly force if necessary." (1 Witkin & Epstein, Cal. Crim. Law (4th ed. 2012) Defenses, § 77, p. 518.) However, "The person who wrongfully attacks, or who voluntarily engages in a fight, and is met by a counterattack, has no privilege to stand his ground and defend." (*Id.*, § 78, p. 519; see *People v. Bolton* (1979) 23 Cal. 3d 208, 215 ["Appellant was clearly the aggressor in the evening's quarrel. He pointed his gun at Hollister at a time when Hollister made no

3

immediate threat against him. When Hollister reached as for a gun, appellant as the aggressor was bound to retreat and not to stand his ground."].)

As we now explain, the evidence relied on by Campbell--his own trial testimony--belies his appellate claim, because it shows Campbell threatened Walker with a gun *before* Walker made the movement Campbell testified he perceived as a deadly threat towards Campbell.

Campbell testified he shot Walker with Campbell's own gun. Before they got in the taxi, Campbell gave Hudson Campbell's bulletproof vest to wear, and Hudson sat in the front seat. After the driver (victim Walker) quoted him a fare, Campbell tried to negotiate a lower fare. Walker turned in his seat to face Campbell, who was seated in the rear of the taxi. Campbell testified he then drew his gun because he thought Walker was speaking in an aggressive manner and did not seem to fear his assailants. Campbell testified that he also sensed Walker might have a gun. He demonstrated to the jury how he held the gun "where [Walker] could see it. And then when I pulled it out, he just threw his hands up." He did this "To pump fear in him." When Campbell got out of the taxi and waited for Hudson to get out, Walker then dropped "his left arm like he's gonna reach for somethin'. [¶] And when he did that, I snatched Hudson out the car" then "just leaned, popped him twice." He believed Walker was reaching for a gun, and shot him twice, not to kill him, but aimed for his arm "to slow him down."

The jury could rationally find that Campbell had been the initial aggressor by drawing his gun so Walker could see it. Contrary to Campbell's claim in the reply brief that no evidence supported the claim that Campbell exhibited the gun to frighten Walker, Campbell *testified* his purpose in displaying the gun was to "pump fear into" Walker, whereupon Walker "threw his hands up." This transformed what Campbell characterized as a business negotiation into a threatening (and criminal) act, namely, brandishing a firearm at Walker. (See *People v. McKinzie* (1986) 179 Cal.App.3d 789, 794 [brandishing under section 417 "complete on *exhibition* of the weapon in a rude, angry,

4

or threatening manner"].)  The jury could rationally find that Walker understood he was being robbed at that point.  Indeed, it is difficult to conceive that any rational jury would not so interpret Campbell's own testimony.  Thus Campbell's self-defense instructions were properly limited by the initial-aggressor rule.

Accordingly, substantial evidence supported the initial-aggressor instruction, and the trial court did not err by providing it to the jury.

B.  *Courtroom Security*

Campbell contends it was prejudicial error for the trial court to allow a uniformed sheriff's deputy to sit near him during his testimony, because no individualized showing was made to justify this security arrangement.  The point is forfeited; further, it fails to persuade.

Before Campbell took the stand, outside the presence of the jury, his attorney asked "that the deputy not stand behind the defendant.  [¶]  I understand that there is a case authority requiring a finding before a deputy needs to stand near or by a testifying defendant.  [¶]  I don't know what the Court is inclined to do in that regard."  The trial court asked the bailiff:  "Are they fine sitting in the seat nearby, rather than just standing?" and the bailiff replied, "They normally will sit next to him, not in the same well but next to the jury box, but they have to be in that general area."  The trial court then placed on the record the layout of the courtroom, and concluded:  "What's being proposed or requested by the deputy is there is seat placed on floor level, which is again several feet away but adjacent to the jury box, but not really in [the jurors'] line of sight.  [¶]  So that is what's being proposed.  Do you wish to make any further statement, Mr. [Campbell's counsel]?"  Campbell's counsel answered *no*, except that he wanted the jury admonished not to consider the fact that Campbell was in custody for any purpose, and the trial court agreed to so instruct the jury.

The trial court gave such an instruction before Campbell testified, as follows:  "I did want to just point out something that's a matter of standard court procedure, which is

5

as you have been advised, we have sheriff's deputies present in court. [¶] There is a deputy in the far corner of the courtroom. At this time, this is a standard procedure. [¶] You're not to hold that against the defendant it any way. It's what happens in every trial when there is an in-custody witness that testifies."

We agree with the People that Campbell's appellate claim is forfeited. Although his trial counsel referenced the need for an individualized finding regarding the presence of a deputy who would *stand* near Campbell, after the trial court described the courtroom and exactly where the deputy would *sit*, and invited further comment, trial counsel asked for--and later received on behalf of his client--an admonitory instruction. Thus, the specific objection to courtroom security argued on appeal was not ever made in the trial court. "Defendant's failure to object and make a record below [forfeits] the claim here." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583; see *People v. Majors* (1998) 18 Cal.4th 385, 406.)

Moreover, the contention lacks merit. Our Supreme Court has rejected Campbell's essential claim, as follows: "We recently considered whether the stationing of a uniformed deputy at the witness stand during a defendant's testimony is such an inherently prejudicial procedure that it must be subjected to heightened scrutiny. Like the Court of Appeal majority in this case, the defendant in [another case] characterized the deputy as a ' "human shackle" ' whose presence at the witness stand improperly focused the jury's attention on his custodial status. [Citation.] We rejected this argument and held that a security officer's presence near a testifying defendant is *not* inherently prejudicial. [Citation.] We observed, 'so long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's decision to permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings.' [Citation.] [¶] However, despite our conclusion that this practice is not *inherently* prejudicial, we cautioned that 'the trial court must exercise its

6

own discretion in ordering such a procedure and may not simply defer to a generic policy.' " (*People v. Hernandez* (2011) 51 Cal.4th 733, 742, italics in original (*Hernandez*).)

Even assuming--as Campbell does--that the trial court simply deferred to a general policy here, the result was not inherently prejudicial, although contrary to our Supreme Court's mandate that the trial court exercise its own discretion. (See *Hernandez*, *supra*, 51 Cal.4th at p. 742.) However, contrary to Campbell's speculation that the trial court's admonition exacerbated any prejudice, we instead presume the trial court's admonition dispelled any adverse inferences the jury might otherwise have drawn from the deputy's presence. (See *People v. Vang* (2009) 171 Cal.App.4th 1120, 1129-1131). We see no reasonable probability that a different result would have been obtained had the trial court acted differently. (See *Hernandez*, *supra*, 51 Cal.4th at p. 746).

C. *Mother's Sentencing Statement*

Campbell contends that because Walker's wife spoke at sentencing, Campbell had a reciprocal due process right to have his mother speak at sentencing. We disagree.

Section 1191.1, originally adopted by the People, in the exercise of their reserved initiative powers as one section of Proposition 8, The Victim's Bill of Rights, provides in part that the next of kin of a deceased victim has "the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express [his or her] views concerning the crime, the person responsible, and the need for restitution. The court in imposing sentence shall consider the statements of . . . next of kin made pursuant to this section and shall state on the record its conclusion concerning whether the person would pose a threat to public safety if granted probation." (See *People v. Sewell* (1989) 210 Cal.App.3d 1447, 1449-1450.)

Relying on broad language in cases involving other criminal procedure contexts, Campbell contends due process requires parity: If the victim's family can speak at sentencing, so, too, may a defendant's family. In particular, Campbell relies on

7

*Wardius v. Oregon* (1973) 412 U.S. 470 [37 L.Ed.2d 82], a case involving an Oregon discovery rule requiring the defendant to give notice if an alibi defense is to be raised, holding that "the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants. Since the Oregon statute did not provide for reciprocal discovery, it was error for the court below to enforce it against petitioner, and his conviction must be reversed." (*Id*. at p. 472 [37 L.Ed.2d at p. 86].) *Wardius* observed in a footnote that the federal high court had become "particularly suspicious of state trial rules which provide nonreciprocal benefits to the State *when the lack of reciprocity interferes with the defendant's ability to secure a fair trial*." (*Id*. at p. 474, fn. 6, italics added [37 L.Ed.2d at p. 87]; see *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 372-377 [acknowledging that discovery must provide a balance of forces between the state and the accused and upholding Proposition 115, the Crime Victims Justice Reform Act against a *Wardius* challenge].)

Here, by the time of sentencing, the trial itself was over, and its fairness could not have been affected by exclusion of Campbell's mother's statement to the court.

Nor do we see how defendant was prejudiced. Defendant was represented by counsel and had the opportunity to present mitigating information to the court by way of the probation report. (See *People v. Murray* (2012) 203 Cal.App.4th 277, 290 ["Murray does not contend how having his mother or grandfather address the trial court would have added anything material to the letters or that it would have led the trial court to impose a lesser sentence"], disapproved on another point by *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1369-1371, 1387; *People v. Ornelas* (2005) 134 Cal.App.4th 485, 489.)

Campbell's probation report reflected his youth and eighth grade education, his admission that he shot Walker along with his statement to the probation officer that he thought Walker might have been armed, and his belief that paranoia he was experiencing at that time may have contributed to his actions. A delinquency study in 2007 reflected that his mother then claimed he had ADHD and was prescribed Adderall, and defendant

8

"reported taking unknown medications while in custody," but he stopped taking them several months before sentencing. Although he used alcohol, cocaine, and heroin, he told the probation officer this "was never a problem." The report also reflects Campbell was on both juvenile and adult probation (multiple grants) at the time of the murder. And we observe that a neuropsychologist testified at trial about Campbell's "full scale I.Q." of 75 viewable as borderline mental retardation, resulting in impaired communication and behavioral-control skills.

Campbell's mother could have spoken to the probation officer, or offered the probation officer a written statement about her son, for inclusion in the probation report, or defense counsel could have included pertinent information from her as part of a written study of Campbell's "background and personality." (§ 1204) Thus, there were other avenues for Campbell's mother's views and knowledge about her son to be considered. We also note that Campbell's mother remains free to provide prison professionals whatever information about his background she believes will assist them in evaluating and treating any conditions he has. That information would not and could not have changed the sentence to be imposed, because here the trial court had no discretionary sentencing calls to make. The life sentence was mandatory given the nature of the crimes and convictions therefore. Thus for multiple reasons, no prejudice appears.

II

*Hudson's Claim*

Hudson claims he was entitled to a duress instruction, based on evidence that he was afraid of Campbell. We disagree.

A trial court must instruct on a defense "only if substantial evidence supports the defense." (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1054.) "On review, we determine independently whether substantial evidence to support a defense existed." (*Id.* at p. 1055.) "Evidence of a defense is sufficiently substantial to trigger a trial court's duty to instruct on it sua sponte if it is sufficient for a reasonable jury to find in favor of

9

the defense." (*People v. Hanna* (2013) 218 Cal.App.4th 455, 462; see *People v. Petznick* (2003) 114 Cal.App.4th 663, 677 (*Petznick*).) "Defendant needs to raise only a reasonable doubt that he acted in the exercise of his free will." (*Petznick*, *supra*, at p. 676.)

Among the persons deemed incapable of committing a crime are "Persons (unless the crime be punishable with death), who committed the act . . . under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (§ 26, par. Six.) "An essential component of this defense is that the defendant be faced with a direct or implied demand that he or she commit the charged crime." (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 567.) " 'The common characteristic of all the decisions upholding [a duress defense] lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm.' " (*People v. Vieira* (2005) 35 Cal.4th 264, 290 (*Vieira*).)

As defendant's proposed instruction (CALCRIM No. 3402) set forth, duress is not a defense to murder, as such, but in cases such as this one, where felony-murder is an available theory, duress can be used to negate the required elements of the underlying felony. (See *People v. Anderson* (2002) 28 Cal.4th 767, 784.)

In pretrial statements, Hudson said had known Campbell, who was older, for years, grew up like brothers and only recently learned they were not actually blood-related. On the night in question, Campbell gave him a bulletproof vest to wear before they called for a taxi, warning Hudson that the driver would be armed, and Hudson would be in the passenger seat, subject to the driver's line of fire. Hudson did not need a gun because either Taylor or Campbell would draw on the driver from the back seat. Campbell made the comment "you tryin to rack up demons, alright." Hudson said, "because . . . the way [Campbell] is towards people, I feel like if I run, he's gonna do sumpin like to try to shoot me or I'm gonna end up gettin shot goin to my house." After

10

Walker quoted a fare, there was a discussion about the change, and Taylor gave Campbell a gun. Hudson turned away because he was "not into killin" and did not like to see blood, "nuthin like that." When shots were fired, Hudson ran away; during their flight Campbell said he should slap or shoot Hudson because he was too slow. Hudson then gave the vest back to Campbell. But when later asked if he feared Campbell, Hudson said "Not really fear of [Campbell]. Just fear of my life. I didn't expect anything like this."

First, we disagree with the Attorney General's suggestion that no evidence supported a duress defense *due to Hudson's decision not to testify*. As Hudson correctly points out, testimony by a defendant is not required to support a duress defense. (Cf., e.g., *People v. Anderson* (1983) 144 Cal.App.3d 55, 62 [rejecting claim that defense of reasonable belief required defendant's testimony; "The flaw in the argument is that it assumes a person's state of mind can only be shown by direct evidence"].) But absent *direct* testimony about his state of mind, Hudson must rely on circumstantial inferences from the evidence--including his pretrial statements--that he actually and reasonably believed his life was in immediate danger if he did not help Campbell rob Walker.

Instead, we find the evidence insufficient because, viewing it in its totality, no rational jury could find that Hudson reasonably believed he was in *imminent* danger if he backed out of the planned robbery. "Rather, the evidence points strongly to the fact that [Hudson's] participation in the murders was not principally motivated by a fear for his life, but rather stemmed from his belief in [Campbell] as a figure of authority." (*Vieira*, *supra*, 35 Cal.4th at p. 290.) "Even if defendant was reluctant to participate, that is not enough to support a finding that he participated in the crimes as a result of a present and active threat of imminent danger." (*Petznick*, *supra*, 114 Cal.App.4th at p. 677.)

Although Hudson first made the comment that he did not back out of the plan and run because Campbell might shoot him then or later, he did not identify any immediate threat by Campbell to harm him. He later clarified he did not fear Campbell. More

11

importantly, Hudson thereafter participated fully in the robbery, by entering the passenger seat of the taxi and remaining there, although he claimed he turned away once he realized Walker's murder was imminent.

It is true, as Hudson points out, that an *explicit* threat is not required, and menace may be inferred from the circumstances. (See *People v. Steele* (1988) 206 Cal.App.3d 703, 706 ["direct or implied demand" required]; accord, *People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1513 [menace for purposes of felony false imprisonment; "Threats can be exhibited in a myriad number of ways, verbally and by conduct"].) But given Hudson's longstanding and close relationship with Campbell and his statement that he did not fear Campbell, but was in fear only due to his vulnerable positioning in the passenger seat, no rational jury could find that Hudson's will was overcome merely based on his comments that he had a generalized fear of retribution from Campbell if he had tried to abort his own participation in the crimes.

Finally, Hudson's statement that Campbell threatened to slap or shoot him during the flight *after* the crimes is of no relevance, because those purported threatening statements came after the robbery and could not have induced Hudson to commit it.

Thus, the trial court properly refused to instruct on duress.

### DISPOSITION

The judgments are affirmed.


                                                           DUARTE          , J.


We concur:

     RAYE              , P. J.

     ROBIE          , J.