Filed 4/24/23  P. v. Tsarnas CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JEFFRY LEE TSARNAS,<br><br>　　　Defendant and Appellant. | A163770<br><br>(Humboldt County<br>Super. Ct. No. CR1900173) |

In November of 2018, defendant Jeffry Tsarnas hit a pedestrian with his car on a bridge and drove on without stopping.  The victim suffered multiple fractures to her foot and ankle.  Tsarnas was convicted by a jury of leaving the scene of an accident causing permanent, serious injury and placed on two years' probation.  Tsarnas appeals, making three arguments:  (1) that substantial evidence does not support the jury's finding that the victim's injury was permanent; (2) that a juror who was also a nurse committed misconduct by offering her opinion that the injury was permanent during deliberations; and (3) that the prosecutor committed misconduct by referring during closing argument to a photo of the victim's injured foot that had not been admitted into evidence.  We affirm.

## BACKGROUND

On November 27, 2018, around 5:30 to 5:40 p.m. on a "dark and foggy" night, pedestrian Marie Kelley was on the Fernbridge near Ferndale when

she was struck from behind by a four-door sedan, which one witness estimated to be travelling about 60 mph. When the sedan hit Kelley, she "went flying into the side of the railing like a rag doll." The sedan did not stop or attempt to slow down. After the incident, Kelley crawled toward the end of the bridge while yelling for help. Kelley was taken to the hospital with a broken foot and ankle, including fractures of her ankle and the third, fourth, and fifth metatarsal bones in her mid-foot.

On December 26, 2019, the Humboldt County District Attorney filed an information charging Tsarnas with failing to perform a legal duty following a vehicle accident that caused permanent, serious injury (Veh. Code, § 20001, subds. (a), (b)(2)) with the special allegation that he personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)). The trial court later granted defense counsel's unopposed motion to dismiss the great bodily injury allegation.

Trial took place over five days in March of 2021. The jury was instructed on both the charged offense and the lesser-included offense of failing to perform a legal duty following a vehicle accident that caused injury. (See Veh. Code, § 20001, subds. (a), (b)(2); Veh. Code, § 20001, subd. (d) [defining " 'permanent, serious injury' " as "the loss or permanent impairment of function of a bodily member or organ"].)

On April 1, the jury found Tsarnas guilty as charged. The trial court later denied Tsarnas's motion for a new trial, suspended the imposition of sentence, and placed Tsarnas on two years' probation.

Tsarnas appealed.

# DISCUSSION
## Substantial Evidence Supports the Jury's Finding of Permanent, Serious Injury

As noted, Tsarnas was convicted under Vehicle Code, section 20001, subdivision (b)(2), which provides for enhanced penalties where the accident "results in death or permanent, serious injury." Vehicle Code section 20001, subdivision (d) defines " 'permanent, serious injury' " as "the loss or permanent impairment of function of a bodily member or organ." And the jury was instructed that "a permanent, serious injury is one that permanently impairs the function or causes the loss of any organ or body part." (CALCRIM No. 2140.)

Tsarnas first argues that substantial evidence does not support the jury's finding that Kelley suffered "permanent, serious injury" within the meaning of Vehicle Code, section 20001, subdivision (d).

"In considering a challenge to the sufficiency of the evidence, 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." ' (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.) We must affirm if ' " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " '

(*People v. Rich* (1988) 45 Cal.3d 1036, 1081, italics omitted.)" (*People v. Chavez* (2021) 69 Cal.App.5th 159, 165–166 (*Chavez*).)

We conclude the evidence supports the finding that Kelley suffered a "permanent, serious injury," which evidence includes the following:

Kelley testified that the incident left her "pretty messed up," and that "I'll have permanent damage for the rest of my life." And, she continued, the incident "just mangled my foot and my ankle. So I had actually had a cage on the outside. It was so—it was so bad that they couldn't—they couldn't cast it. They actually had to put pins in and I had to carry my foot for a couple months." At the time of trial, Kelley had already undergone two surgeries, and had "more to come too." When asked whether she had further surgeries scheduled, she responded: "Not scheduled. I have just—go figure. I'm a cancer survivor. I had just had a seven-pound tumor removed from me just a couple months ago, so I really, that's been kind of like the last has been my priority. After all that was settled in I have every intention of going back to orthopedic and getting further work done on my foot, yes." Kelley also testified that she "should be doing physical therapy after the surgery," and would be "picking [that] up pretty soon."

The jury also heard the testimony of Dr. Jabari Reeves, the emergency doctor who treated Kelley the night of the incident. He testified that Kelley suffered fractures of her ankle and the third, fourth, and fifth metatarsal bones of her mid-foot.

In *Chavez, supra*, 69 Cal.App.5th 159, the Court of Appeal considered a challenge to the sufficiency of the evidence supporting the jury's finding that the victim had suffered a "permanent, serious injury" within the meaning of Vehicle Code, section 20001, subdivision (d). The victim, Torres, testified— nine months after the incident—that he had had two surgeries on his left

4

tibia and fibula, the first of which placed a metal plate and screws in his leg. (*Chavez, supra*, 69 Cal.App.5th at p. 163.) Torres "showed his injuries to the jury and noted that he still had an open wound. For the first few months after the accident, his pain level was 10 on a scale of 1 to 10. At the time of trial, his pain level by the end of each day was always four or five. In the months following the accident he underwent painful physical therapy to regain his ability to walk, stand, sit, and climb stairs. He still needed physical therapy, but had to stop after three months due to the COVID-19 pandemic. As a result of his injuries it was difficult to walk, sit, and sleep and he could no longer run. He also had balance problems and had been unable to return to his construction job." (*Ibid.*)

Torres's treating orthopedic surgeon also testified and offered an expert opinion that "the injury had 'fail[ed] to heal in a sufficient amount of time.' " (*Chavez, supra*, 69 Cal.App.5th at p. 163.) For such injuries, " 'it's not uncommon' " for a patient to require " 'between about four and seven surgeries and sometimes more.' " (*Ibid.*) The doctor "was 'not sure' if Torres would need additional surgeries and 'hop[ed]' he would not, but was 'prepared to further escalate the type of surgery [Torres] would need.' " (*Id.* at p. 164.) "The doctor went on to opine it was 'likely' that Torres's injured leg would '[n]ever heal in a way that it will be as good as it was prior to the accident[,]' and would 'probably not' 'ever heal in a way that it will be as good as the non-injured leg.' " (*Ibid.*)

The *Chavez* court concluded: "Here, the jury was presented with evidence that the broken bones in Torres's leg still had not healed nine months after the accident and that his injuries impacted his ability to walk, balance, and sleep. Moreover, Dr. Tilan opined that the function of Torres's leg was permanently impaired. This evidence is sufficient to support the

5

jury's finding" that the injury was permanent.  (*Chavez, supra,* 69 Cal.App.5th at p. 168.)  By analogy to the law of mayhem, which requires an injury that is "more than ' "slight [or] temporary," ' i.e., permanent," *Chavez* also noted that "[t]he long duration of an injury, such as a broken ankle that has not fully healed after more than six months, may support an inference that the injury is permanent and that the defendant is thus guilty of mayhem. [Citations.]"  (*Id.* at p. 168.)

Tsarnas contrasts the evidence of permanent injury in this case from that in *Chavez,* noting that there was no expert testimony about the permanence of Kelley's injuries and that Kelley did not herself testify about her current level of pain or the impact of her injury on her daily living or employment.

We conclude that, viewing "the entire record in the light most favorable to the judgment," substantial evidence supports the jury's finding that Kelley's injuries were permanent.  (*Chavez, supra,* 69 Cal.App.5th at p. 165.) Kelley testified that the incident had "messed up" and "mangled" her foot, an injury "so bad" that doctors could not place it in a cast and instead had to surround it with a cage.  She had already had two surgeries, and at the time of trial—some 2 years and 4 months after the incident—still needed further surgery as well as physical therapy. (Cf. *Chavez, supra,* 69 Cal.App.5th at p. 168 [injury lasting more than six months supports inference of permanent damage].)  Her doctor testified that her foot and ankle were fractured in four different places.  Although no expert opinion was offered regarding the permanence of her injury, Tsarnas cites no authority for the proposition that expert testimony was required.  Kelley herself testified that she would "have permanent damage for the rest of my life," and the jury was permitted to credit this testimony.  (See Evid. Code, § 411 ["the direct evidence of one

6

witness who is entitled to full credit is sufficient for proof of any fact"]; *People v. Scott* (1978) 21 Cal.3d 284, 296 ["The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable"].)  From the serious nature of the injury, the fact that Kelley had and would require multiple surgeries, the length of time since the incident, and Kelley's own testimony, the jury could permissibly infer that she had suffered "permanent, serious injury" within the meaning of Vehicle Code, section 20001, subdivision (d).

### The Trial Court Did Not Abuse Its Discretion in Denying the Motion for a New Trial Based on Juror Misconduct

#### Additional Background

On September 1, 2021, defense counsel filed a motion for a new trial pursuant to Penal Code[1] section 1181 on the grounds of juror and prosecutorial misconduct.  With respect to juror misconduct, the motion alleged that Juror No. 2, who was a registered nurse, "told the other jurors in her professional opinion because the injury was to a lower limb it was likely a permanent injury" and that "[a] subsequent juror confirmed this information and indicated she would have voted differently had that 'expert' opinion in the jury room not have been rendered."

On September 2, defense counsel requested a two-week continuance. Defense counsel indicated that Juror No. 2 "initially agreed to sign the declaration that was read to her over the phone [but] has subsequently asked us not to contact her," and requested a continuance so that Juror No. 2 could be subpoenaed to appear.

A hearing on the motion was held on September 22, at which Juror No. 2 testified.  When asked whether she "discuss[ed] with the jurors [her]

---

[1] All further undesignated statutory references are to the Penal Code.

7

thoughts about weight bearing injuries," she answered, "I pointed out that her injury is on a weight bearing limb which any person would deduce." She did not "indicate to the other jurors what an injury to a weight bearing limb would require as far as treatment." And when asked whether she gave her opinion to other jurors about whether the injury would be permanent, she responded that "we discussed that the injured had mentioned that she had not gone to her follow-up care appointments, and she had not—and that she would require follow-up surgeries. . . . Based on that is how we came to the conclusion that this might be ongoing if she continued to not follow-up with her post op care." Juror No. 2 added that "[w]hat I said was that the recovery is different than if she had broken her clavicle or a rib, that she obviously is going to need follow up" and that "I don't recall saying as an RN these are the things that I know." When asked whether she told the defense investigator that she had told other jurors that a weight-bearing injury would require additional surgeries, she responded: "That was based on what the injured had told us . . . that she was going to need more surgeries. I don't profess to know about all orthopedic injuries and need for follow up."

The court set a further hearing for October 18th.

On September 22, defense counsel filed a brief declaration from Juror No. 8, indicating that "[a]s a part of the jury deliberations a fellow jur[or] offered their opinion on whether or not the injury was life altering or permanent," that that "fellow juror was a nurse by profession," that she "shared that in her work experience the injury would most likely be a permanent injury," and "[t]he information I received from that jur[or] influenced my decision in deciding on the nature of the injury."

A further hearing was held on October 13, at which Juror No. 8 testified. She testified that she considered Juror No. 2's opinion "as well as

8

the rest of the testimony" in reaching a decision in the case. She answered "Yes" when asked if Juror No. 2 "express[ed] statements that in her experience the injury would be a permanent injury," that she understood that experience to be Juror No. 2's "medical experience as a nurse," and when asked whether she took "that into account in reaching your verdict," answered "I believe so."

At the conclusion of the hearing, the trial court denied the motion for a new trial, concluding that "[a]s far as the testimony regarding Juror Number 2's purported expertise with injuries as well as her statement in the jury room about it being a permanent injury, the Court will find on that issue that the—even assuming that that is what transpired, that it was not enough to constitute juror misconduct" because "the juror we heard from today indicated that she at least did not rely exclusively on the Juror Number 2's opinion, but instead formed her conclusion based on what was presented at trial as well," including testimony from the treating physician and the victim herself.

### Applicable Law

A motion for a new trial may be granted on the ground of juror misconduct. (§ 1181, subds. 2, 3, 4.) "The trial court is vested with broad discretion to act upon a motion for new trial. (See *People v. Ault* (2004) 33 Cal.4th 1250, 1260.) When the motion is based upon juror misconduct, the reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence, but must exercise its independent judgment to determine whether any misconduct was prejudicial. (*People v. Tafoya* (2007) 42 Cal.4th 147, 192; see also *People v. Ault, supra,* 33 Cal.4th at pp. 1263–1265.)" (*People v. Dykes* (2009) 46 Cal.4th 731, 809.)

9

In *People v. San Nicolas* (2004) 34 Cal.4th 614 (*San Nicolas*), our Supreme Court gave the following explanation of the applicable law regarding improper juror expertise:

" ' "It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of an issue is misconduct." ' (*People v. Steele* (2002) 27 Cal.4th 1230, 1265 (*Steele*), quoting *In re Malone* (1996) 12 Cal.4th 935, 963.) [¶] . . . [¶]

" 'A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations. . . .' (*Id.* at p. 1266.)" (*San Nicolas*, *supra*, 34 Cal.4th at pp. 649–650.)

**Analysis**

In *San Nicolas*, the trial court denied defendant's motion for a new trial based on juror misconduct where, as here, the defendant alleged that a juror who was also a nurse improperly asserted her expertise during deliberations,

10

in part by "explain[ing] a number of the medical issues relating to blood pressure and circulation." (*San Nicolas, supra,* 34 Cal.4th at pp. 643, 648.) Our Supreme Court affirmed, with this language:

"Similarly, in the present case, the evidence presented in support of defendant's motion for a new trial does not show that [the nurse-juror] offered the jurors any basis for deciding the case other than the evidence and testimony presented at trial. No declaration suggests that she made any assertion inconsistent with the properly admitted evidence and testimony. Indeed, the remarks attributed to her in her declaration are consistent with the trial testimony of the pathologist, who expounded at length on the concept of blood flow, circulation, and the meaning of 'shunting.' The trial court did not abuse its discretion in ruling that [the nurse']s explanation of blood evidence was not misconduct." (*San Nicolas, supra*, 34 Cal.4th at p. 650.)

Similarly here, we conclude that the trial court did not abuse its discretion in concluding that there was no juror misconduct. Juror No. 2 was permitted to use her background, including her medical knowledge, to evaluate and interpret the evidence. According to her testimony, she based her conclusion that Kelley's injury was permanent on the fact it was a weight-bearing injury, as well as Kelley's testimony that she would require further surgeries and had not attended her "follow-up care," by which she presumably meant Kelley's testimony that she would be "getting further work done on my foot," "should be doing physical therapy after the surgery," and would be "picking [that] up pretty soon." To the extent this even rises to the level of Juror No. 2 bringing her medical experience to bear on the evidence at trial, it was permissible.

Moreover, these statements are fully consistent with Juror No. 8's testimony that Juror No. 2 "express[ed] statements that in her experience the injury would be a permanent injury." Neither juror's testimony provides any basis to conclude that Juror No. 2 "offered the jurors any basis for deciding the case other than the evidence and testimony presented at trial," gave an "opinion explicitly based on specialized information obtained from outside sources," or offered one "different from or contrary to the law as the trial court stated it or to the evidence." (Cf. *In re Malone, supra*, 12 Cal.4th at pp. 948, 963–965 [juror misconduct for psychologist to opine on accuracy of polygraph test based on having "read and discussed professional articles on the subject in the course of her studies in psychology" including specific accuracy rates discussed in those articles].) At worst, Juror No. 2 brought her medical experience to bear in evaluating the evidence before the jury. We find no abuse its discretion in the trial court's conclusion that this did not rise to the level of juror misconduct.

**There Was No Prejudicial Prosecutorial Misconduct In Referring to Photo Exhibit Not in Evidence**

**Additional Background**

During the prosecution's case-in-chief, People's Exhibit No. 9 was marked for identification, described in the minutes as a "color photo of a swollen and bruised foot elevated on black fabric." No witness testified about the photograph, and it was not admitted into evidence. However, during his rebuttal closing argument, the prosecutor told the jury "[w]hat's marked as People's 9 is a photograph of Ms. Kelley's foot that you can take a look at as well."[2]

---

[2] Defense counsel's new trial motion indicates that the prosecutor "held up" the exhibit during his closing argument. No declaration supporting the motion appears in the record, and the parties have not pointed us to any

12

During deliberations, the jury made a written request to see "[t]he photo of Ms. Kelley's foot." In discussing the request with counsel, the court stated "I believe they have that. That should be Exhibit No. 9 in our records. So what I would respond to them then is just to let them know it's Exhibit No. 9 is the photo of the foot." Counsel agreed with this response, and the court's written response stated "that photo is Exhibit number 9. Please let me know if you do not have the exhibit." The jury wrote back "We do not have Exhibit #9. Thank you for sending down."

In discussing the jury's response, the trial court indicated that court staff had reviewed the records and concluded that People's Exhibit No. 9 was never entered into evidence. The prosecution then moved to reopen the evidence for the limited purpose of admitting the exhibit. The court concluded, based on a review of the transcript, that a foundation had not been laid for admitting the exhibit and denied the motion. Defense counsel then proposed an admonition, and the jury was told in writing that "Exhibit No. 9 was not admitted into evidence and should not be considered by the jury."

As part of his motion for a new trial, Tsarnas argued that the prosecutor's reference to Exhibit No. 9 during closing argument constituted prosecutorial misconduct.

At the October 13 hearing on the new trial motion, Juror No. 8 testified that she did not recall the prosecutor holding up a photograph during his closing argument, nor did she recall the jury asking for an exhibit that was ultimately not provided.

---

other indication in the record that People's Exhibit No. 9 was actually shown to the jury.

The trial court denied the motion for a new trial on the ground of prosecutorial misconduct, noting that no objection was made by defense counsel during closing argument and that an admonition was given to the jury not to consider the exhibit.

**Applicable Law**

Section 1181, subdivision (5), provides that a new trial may be granted when the prosecutor has "been guilty of prejudicial misconduct during the trial thereof before a jury."

"A prosecutor's conduct ' "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' [Citation.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' (*People v. Rhoades* (2019) 8 Cal.5th 393, 418.) Under state law, 'bad faith on the prosecutor's part is not required.' (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)" (*People v. Zarazua* (2022) 85 Cal.App.5th 639, 644.)

We review a trial court's ruling on a motion for a new trial based on prosecutorial misconduct for abuse of discretion. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 213; *People v. Lightsey* (2012) 54 Cal.4th 668, 729.)

" '[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. [Citation.]' (*People v. Crew* (2003) 31 Cal.4th 822, 839." (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

14

**Analysis**

The Attorney General argues that Tsarnas has failed to preserve his claim for appeal because defense counsel did not object to the prosecution's mention of Exhibit No. 9 during closing. Tsarnas argues that if his claim has been waived, his trial counsel provided ineffective assistance in failing to make an objection. Because an objection would have led to an admonition, and an admonition was in fact given to the jury, we will consider the merits of Tsarnas's argument. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party"].)

We conclude that the trial court did not abuse its discretion in concluding that the prosecutor's reference to Exhibit No. 9 during closing argument was not "prejudicial misconduct." Although " '[s]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct,' " *People v. Armstrong* (2019) 6 Cal.5th 735, 797, that is not exactly what occurred here. At worst, the jury was briefly shown and told to consider a photograph of the victim's foot for which no evidentiary foundation had been laid. As noted, it is not even clear that the jury was ever actually shown the exhibit at issue. And even if they were, the photograph of Kelley's injured foot did not state any "facts" not in evidence—the defense did not dispute that Kelley's foot was injured, and the principal question for the jury was whether that injury was "permanent" and "serious," a question to which the photograph had, at best, limited relevance. As discussed, there was other, better evidence of the fact that Kelley's injury was serious and permanent, including her own testimony and that of the emergency room doctor who treated her.

More importantly, the jury was given a curative admonition, that "Exhibit number 9 was not admitted into evidence, and should not be considered by the jury." We "must presume jurors follow instructions and obey admonitions." (*People v. Hem* (2019) 31 Cal.App.5th 218, 230; see *People v. Vang* (2009) 171 Cal.App.4th 1120, 1129; *People v. Zack* (1986) 184 Cal.App.3d 409, 416.) And "prosecutorial misconduct is ordinarily presumed to be cured by a proper admonition." (*People v. Green* (1980) 27 Cal.3d 1, 30, abrogated on another ground by *People v. Martinez* (1999) 20 Cal.4th 225, 234–239.) "It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' (*People v. Seiterle* (1963) 59 Cal.2d 703, 710.)" (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.) This is not such an exceptional case, and the admonition was sufficient to cure any potential prejudice. (See *People v. McNally* (2015) 236 Cal.App.4th 1419, 1429 [no error in denying motion for mistrial after unredacted version of video inadvertently played and jury was admonished to disregard it]; *People v. Price* (1991) 1 Cal.4th 324, 428 ["thorough and forceful" admonition sufficient to prevent any prejudice from witness's reference to having taken lie detector tests].)

## DISPOSITION

The judgment is affirmed.

16

_____

Richman, J.


We concur:


_____

Stewart, P.J.


_____

Markman, J. *


*People v. Tsarnas* (A163770)


      *Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.