Filed 8/2/22 P. v. Tapia CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JEFFREY TAPIA, Defendant and Appellant. | F080357 (Super. Ct. No. BF164183A) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Kenneth C. Twisselman II, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Christopher J. Rench and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Jeffrey Tapia shot and killed Benjamin Mendoza while he was walking home in South Bakersfield. A jury convicted appellant of second degree murder (Pen. Code, § 187, subd. (a); count 1),[1] participating in a criminal street gang (§ 186.22, subd. (a); count 2), and being a felon in possession of a firearm (§ 29800, subd (a)(1); count 3), and found true enhancements for personal use of a firearm (§§ 12022.53, subd. (d), 12022.5, subd. (a)) and for acting for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The trial court sentenced appellant to an indeterminate term of 15 years to life on count 1, plus an additional 25 years to life for the firearm enhancement, but stayed the remaining counts and enhancements pursuant to section 654.

On appeal, appellant raises claims of instructional error, which we reject. Appellant also contends his substantive gang offense conviction and gang enhancement findings must be reversed in light of newly enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.). Respondent concedes, and we accept respondent's concession. We reverse the conviction for the substantive gang offense and true findings for the gang enhancements, and we remand the matter to give the People the option of retrial. In all other respects, we affirm.

## FACTUAL BACKGROUND

### I. Murder of Benjamin Mendoza.

On May 11, 2016, around 9:10 p.m., Benjamin Mendoza left his nephew's residence in South Bakersfield to walk home. Less than a minute after he left, a white car made a U-turn and stopped in front of Mendoza at the intersection of Del Mar Drive and Madison Street. A subject exited the front passenger's side and opened fire with a handgun. The shooter struck Mendoza in the back of his left upper arm, the back of his leg, and the middle of his back, killing him.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2.

Mendoza's nephew lived near the corner of Del Mar Drive and Madison Street and witnessed the shooting from his front yard. The nephew testified Mendoza stopped by his house on his way home from work to visit and play with his kids. Less than a minute after Mendoza left to walk home, the nephew heard several gunshots. He turned and saw a skinny Hispanic male with short hair in a white shirt shooting a gun. After the Hispanic male finished shooting, he got into the front passenger's seat of a newer model four-door white car that he believed may have been a Nissan or a Honda. Three other witnesses provided a similar description of the car.

The shooting was captured on surveillance video by a camera on a nearby residence. The video shows Mendoza walking home as a white sedan drives down the street, makes a U-turn, and stops nearby. The right front passenger door opens and a subject in a light-colored shirt steps just outside of the car. Due to the poor quality of the video one cannot make out a weapon in the subject's hands. However, immediately after the subject steps out of the car there is a series of discernable muzzle flashes. The subject then gets back into the front passenger's seat, and the white sedan leaves the area. The entire transaction lasts about 10 seconds.

Kern County Sherriff's Office personnel located seven expended cartridge casings at the scene. Each casing was .380-caliber with a "GFL" head stamp. No firearm or other weapon was located on Mendoza's person.

## II.    Appellant's Arrest.

Approximately one hour after the shooting, sheriff's deputies were dispatched to an unrelated disturbance about four miles away on Bergquist Street. A deputy who was at the scene of the shooting responded to the disturbance call within five minutes. When he arrived, he saw a newer white four-door Toyota Camry parked on the street against the sidewalk. He contacted the occupants and located appellant in the rear passenger's seat, Ricky Cortez in the driver's seat, and Daniel Marquez in the front passenger's seat.

3.

The deputy asked appellant what they were doing, and appellant responded they were waiting for his girlfriend. He asked appellant to tell him his girlfriend's name and where she lives, but appellant only responded that he would call her on his cell phone. During this interaction, appellant and his companions became increasingly nervous. The deputy also began to receive information over dispatch that the Mendoza shooting involved a white car with multiple occupants. Based on this, he backed away from the car and waited for backup to arrive before investigating further. Once additional deputies arrived, they ordered appellant and his companions out of the car one at a time.

Deputies searched the car and located a loaded .380-caliber semi-automatic firearm under the front passenger's seat. The barrel of the gun was pointed toward the front of the car. The magazine was loaded with five .380-caliber cartridges with "GFL" head stamps. Deputies also located a box of ammunition in the backseat containing five .380-caliber cartridges, also with "GFL" head stamps.

A deputy performed a patsearch on appellant. In his right front pants pocket, she located four .380-caliber cartridges with "GFL" head stamps. When she removed the cartridges, appellant asked, "[W]hose are those?" After appellant was placed in the back of a patrol car, he asked the deputy to retrieve his phone from the car to call and inform a female friend that he had been arrested. He identified his phone as a Metro PCS phone with a broken screen. Cell phones associated with Cortez and Marquez were also located inside of the car.

When arrested, appellant was wearing a white shirt. Cortez was wearing a dark blue shirt. Marquez was wearing a dark blue shirt with a white T-shirt underneath.

Mendoza's nephew was transported to the scene of the arrest for a field showup. He was shown appellant, Cortez, and Marquez one at a time. The nephew identified appellant, but he remarked he was only "about 60 percent" sure. He was also shown the white Camry and identified it as the white car involved in the shooting.

When appellant was initially contacted by deputies, he was calm and cooperative, but his speech was slow, and he appeared drowsy and possibly under the influence of marijuana. After appellant was transported to the sheriff's department to be interviewed, detectives became concerned appellant was under the influence of a narcotic and was so intoxicated that he would be unable to understand and waive his *Miranda*[2] rights or give a coherent interview. The interview was therefore delayed until after noon the next day.

## III.     Appellant's Interview.

Appellant's recorded interview was played for the jury in its entirety. Appellant began the interview by claiming he could not remember the events of the previous night because he was under the influence of Xanax. He stated he consumed four Xanax "bars" in the morning and seven Xanax "bars" around 8:00 p.m. He recalled being picked up from his girlfriend's house by Cortez and Marquez in the white Camry, but that he started "passing out in the back seat" and could not remember anything else.

Detectives told appellant that a witness had identified him as the shooter based on his white shirt. They also asked appellant how he would respond when they found his DNA on the firearm in the car. Appellant then admitted there was a firearm in the white Camry when he was picked up, and that he may have handled the firearm and a box of .380 ammunition. However, he continued to deny involvement in the shooting.

Detectives employed a ruse in which they told appellant that Cortez told them appellant shot Mendoza in self-defense. Appellant then claimed the shooter was a fourth person in the car named "Pepper," who was sitting in the backseat on the driver's side. He alleged "Pepper" and Cortez argued with Mendoza in the middle of the road for five minutes. When "Pepper" and Cortez got back into the car, Mendoza moved in front of it. "Pepper" then exited the car and shot Mendoza.

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

Appellant's version of events changed again after detectives confronted him with the surveillance video, which showed the shooter exiting from the front passenger's seat. Appellant admitted to being the shooter, but claimed he shot in self-defense. He stated that after they left a marijuana shop, Cortez took them on a "detour" to collect money from Mendoza related to a gun purchase. Appellant was in the front passenger's seat and Marquez was in the backseat. Cortez parked the car and got out to speak with Mendoza while appellant and Marquez remained inside. Cortez and Mendoza argued for about five minutes, then Cortez got back into the car and put a gun in his lap. As they started to drive away, Mendoza approached the car cursing at Cortez and yelling that he was going to kill him. As Cortez attempted to drive away, Mendoza pulled a gun from his waistband, banged on the window with the gun, and aimed it inside. Appellant then grabbed the gun from Cortez, stepped out of the car, and fired three shots at Mendoza.

Appellant identified himself in the surveillance video as the person seen stepping out of the front passenger's seat and shooting Mendoza.

## IV. Forensic Evidence.

### A. Tool Marks.

The firearm found in the Camry and the seven cartridge casings located at the scene of the shooting were examined by a firearms expert with the Kern Regional Crime Laboratory. She test-fired the firearm and compared the tool marks on the test-fired casings to those recovered at the scene. Based on her examination, she opined that the casings from the scene of the shooting had all been fired by the firearm found in the car.

### B. DNA.

The firearm was also swabbed for DNA. One swab was taken from the trigger and trigger guard, and another from the handle grip and hammer. The samples were analyzed by a DNA expert with the Kern Regional Crime Laboratory. He explained that both samples contained DNA from at least three contributors. As to the trigger and trigger

guard sample, appellant could not be excluded as a potential contributor, and it is 290 million times more likely to have originated from appellant than a random unrelated person in the Hispanic population. As to the sample from the handle grip and hammer, appellant could not be excluded as a potential contributor, and it is 1.7 quintillion times more likely to have originated from appellant than a random unrelated person in the Hispanic population.

### C. Cell Phones.

Cell phones associated with appellant, Cortez, and Marquez were recovered from the Camry and were examined using a forensic program for cell phones.

On the phone associated with appellant, detectives located a photograph taken April 17, 2016, that depicts appellant holding the firearm recovered from the Camry.

On the phone associated with Marquez, detectives located several text messages from the day of the shooting. Around 5:40 p.m., Marquez sent an outgoing text asking, "[W]here are the Xannys." He then sent a text stating, "I'm looking for them," followed by a text stating, "and for some body." Included in the last text was a photograph of Marquez holding the same firearm recovered from the Camry. At 5:50 p.m., Marquez sent an outgoing text asking, "you know anybody with 380 bullets."

On the phone associated with Cortez, detectives located an outgoing text sent 13 minutes after the shooting stating, "yeee left to right we offn n-i-g-g-a-z."

## V. Gang Evidence.

The People's gang expert testified that in 2016, the East Side Bakers (ESB) were an active criminal street gang in Bakersfield. He opined that appellant was an active member of ESB based on his tattoos, social media, law enforcement contacts, and involvement in the charged crimes. He similarly concluded that Marquez was also an active member, and that Cortez was an associate.

7.

Based on hypothetical questions mirroring the alleged offenses, the gang expert opined the shooting was committed for the benefit of ESB because it involved the gang's primary activities and shows other gangs and people in the community that ESB members are willing to commit these types of shootings.

During his interview, appellant told detectives that a few days prior to the shooting, members of the Okie Bakers gang attempted to rob him at gunpoint for his Xanax pills. The attempted robbery occurred near the intersection of Del Mar Drive and Madison Street, the location of the Mendoza shooting. The gang expert explained that this intersection does not fall within the "traditional boundaries" of any Hispanic gang, but that it is near the territory of the Okie Bakers. Based on this, he opined that the shooting may have been motivated by a desire to show that ESB members will not tolerate "disrespect," and are willing to retaliate, thereby benefitting the gang.

The gang expert found no evidence Mendoza was a member of a gang or was otherwise gang affiliated.

## VI.    Other Crimes Evidence.

The People presented uncharged crime evidence pursuant to Evidence Code section 1101, subdivision (b), of a shooting that occurred the day before Mendoza's murder. Around 4:25 p.m. that afternoon, a witness was driving on "P" Street in Bakersfield when she saw a Hispanic male shooting at a house. The shooter was standing outside of a white four-door Toyota sedan that she believed may have been a Camry. After the shooting, the shooter got back into the driver's seat. She could not see anyone else in the car. After the shooting, the witness was unable to identify anyone in photographic lineups. When asked in court to compare appellant to what she remembered of the shooter, she stated appellant appeared younger and slimmer.

Law enforcement located seven expended .380-caliber cartridge casings with "GFL" head stamps at the scene of the "P" Street shooting. The tool marks on the

casings were examined by the People's firearms expert, and she concluded the casings were fired by the .380-caliber firearm recovered from the white Camry in which appellant was arrested.

On the cell phone associated with appellant, law enforcement discovered an outgoing text at 6:08 p.m. on the day of the "P" Street shooting, stating, "[C]ome by yourself, cops everywhere, I slumped him." Shortly after, he sent a text stating, "I need a ride. Slumped a week n-i-g-g-a." At 7:25 p.m., he sent a text stating, "[W]aiting for a ride, just shot someone."

## VII. Defense Case.

Appellant's sole witness was an expert in clinical and forensic toxicology. He described the effects of Xanax abuse, which can include amnesia and paranoia. In extreme cases, an abuser can develop a "confusional state" where they have difficulty processing information and may experience memory loss or hallucinations. In response to a hypothetical question mirroring appellant's claim of consuming 11 Xanax "bars" in one day, the expert explained such use would have a significant impact on the brain and would take a long period of time to be processed by the body.

## DISCUSSION

### I. The jury instructions did not suggest the jury could find appellant guilty of murder without considering heat of passion and imperfect self-defense.

Appellant contends the instructions given by the trial court led the jurors to believe they could convict appellant of murder without considering the potential applicability of either theory of voluntary manslaughter. He bases this contention on two aspects of the instructions. First, he argues the instruction setting forth the elements of murder (CALCRIM No. 520) was misleading because it did not state *within that instruction* that to find appellant guilty of murder the jurors must find beyond a reasonable doubt that appellant was not acting in the heat of passion or in imperfect self-defense. Second, he claims the court's instructions that the jury could not return a verdict on a lesser included

9.

offense unless it found him not guilty of the greater (CALJIC Nos. 8.75 &17.49) compounded this confusion by suggesting the jurors could stop deliberating after finding him guilty of murder, without considering either theory of voluntary manslaughter.

### A. Background.

At the conclusion of the trial, the trial court instructed the jury on the applicable law of homicide using several CALCRIM and CALJIC instructions. The court explained the general principles of the law of homicide (CALCRIM No. 500), noting that appellant was "charged with murder," and that "[m]anslaughter is a lesser offense to murder." Next, the court instructed on the elements of murder (CALCRIM No. 520) and first degree murder (CALCRIM No. 521), and the effect of provocation (CALCRIM No. 522). The trial court then gave CALJIC No. 8.75, which instructed the jury, among other things, that the court could not accept a verdict of guilty of voluntary manslaughter unless the jury also returned a verdict of not guilty of first and second degree murder. Finally, the trial court instructed on voluntary manslaughter based on a sudden quarrel or in the heat of passion (CALCRIM No. 570) and voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571).

Following closing argument, the court instructed the jury that if it found appellant guilty of a greater offense, it should not complete the verdict forms on the corresponding lesser offenses (CALJIC No. 17.49).

### B. Standard of review.

We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67–68; *People v. Bacon* (2010) 50 Cal.4th 1082, 1110.) "We interpret the instructions so as to support the judgment if they are reasonably susceptible

10.

to such interpretation, and we presume jurors can understand and correlate all instructions given." (*People v. Vang* (2009) 171 Cal.App.4th 1120, 1129.)

### C. Discussion.

#### 1. We decline to find forfeiture.

As a threshold matter, respondent contends appellant forfeited his instructional error claim by failing to object below. (See *People v. Campbell* (2020) 51 Cal.App.5th 463.) Appellant responds that the error is not subject to forfeiture because it pertains to the People's burden of proof and the trial court's sua sponte duty to provide correct statements of law. In the alternative, appellant raises ineffective assistance of counsel based on trial counsel's failure to object to the instructions.

We decline to find forfeiture. Although trial counsel did not object to the jury instructions as given, section 1259 permits the appellate court to "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." Appellant argues the instructions were so misleading they removed a critical factual issue from the jury's consideration, effectively lowering the People's burden of proof. If appellant is correct, the alleged instructional error affected his substantial rights. Therefore, these claims are cognizable on appeal despite appellant's failure to object below. (See *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7; *People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7.)

#### 2. Instructional error did not occur.

We begin by observing appellant does not suggest that the jury instructions misstated the law. He does not contend the instructions actually omitted the requirement that the jury find beyond a reasonable doubt he did not act in imperfect self-defense or as the result of a sudden quarrel or in the heat of passion before finding him guilty of murder. Rather, the focus of appellant's claim is on how the instructions were organized. He claims the order in which the information was presented to the jury was so confusing

11.

that it led the jurors to convict him of murder without considering either theory of voluntary manslaughter.

We conclude the jury instructions were not confusing or misleading. The instruction for voluntary manslaughter based on heat of passion stated: "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." The instruction for voluntary manslaughter based on imperfect self-defense stated: "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another. If the People have not met this burden, you must find the defendant not guilty of murder." These instructions clearly and unequivocally conveyed to the jury that it must conclude beyond a reasonable doubt that neither theory of voluntary manslaughter is applicable before convicting appellant of murder.

Despite this, appellant argues the instructions could have mislead the jurors into ignoring voluntary manslaughter because it was not explicitly referenced in the instruction setting forth the elements of murder (CALCRIM No. 520). We are not persuaded. In evaluating whether an instruction is misleading, we consider the "instructions as a whole," and we "assume that jurors are intelligent and well able to understand and integrate all the instructions given." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 791 (*Holmes*).) " '[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial.' " (*People v. Burgener* (1986) 41 Cal.3d 505, 538–539, disapproved on other grounds by *People v. Reyes* (1998) 19 Cal.4th 743, 756.) Given these standards, we have no reason to doubt the jury's ability to comprehend and apply the court's voluntary manslaughter instructions even though they were separate from the instruction defining the elements of murder.

Moreover, we find the manner in which the instructions were organized provided the jurors with a clear and logical framework to apply the law to the evidence. The trial court began by instructing the jury on the general principles of homicide, proceeded to the elements of murder, and concluded with voluntary manslaughter. It makes sense to instruct the jurors in this order because "[a] killing that would otherwise be murder is reduced to voluntary manslaughter" if there is a reasonable doubt as to whether the defendant killed in the heat of passion or in imperfect self-defense. (CALCRIM Nos. 570 & 571; *People v. Rios* (2000) 23 Cal.4th 450, 461 ["These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter 'by *negating the element of malice* that otherwise inheres in such a homicide [citation].' "].)

We also conclude the trial court's use of CALJIC No. 8.75 and CALJIC No. 17.49 was proper and did not mislead the jury. Nothing in either instruction stated or implied that the jury was permitted to stop deliberating once they unanimously agreed appellant was guilty of murder without considering the potential applicability of either theory of voluntary manslaughter. In giving CALJIC No. 8.75, the trial court explained: "[Y]ou have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it to be productive to consider and reach tentative conclusions on all charged and lesser crimes before reaching any final verdicts." This clarified for the jury that it "could 'deliberate' in any order it wished but must 'determine' guilt according to a certain order." (*People v. Wharton* (1991) 53 Cal.3d 522, 572–573.) Similarly, the CALJIC No. 17.49 instruction merely delineated that the jury did not need to complete a *verdict form* for a lesser included offense if it found appellant guilty of the greater. It did not express or imply that the jury did not need to consider the potential applicability of lesser offenses before finding appellant guilty of murder.

Appellant contends the fact that the voluntary manslaughter instructions were given after CALJIC No. 8.75 further created the impression that the jury did not need to

13.

consider voluntary manslaughter. As we explained above, we "assume that jurors are intelligent and well able to understand and integrate all the instructions given." (*Holmes*, *supra*, 12 Cal.5th at p. 791.) Moreover, the first instruction given to the jury, CALCRIM No. 200, reminded them to "[p]ay careful attention to all of these instructions and consider them together." Accordingly, we conclude the placement of CALJIC No. 8.75 relative to the voluntary manslaughter instructions was not confusing or misleading.

Based on this record, appellant has not demonstrated a reasonable likelihood that the jury understood the instructions in the way he asserts. Thus, the challenged instructions are not subject to an erroneous interpretation. Therefore, our de novo review reveals that instructional error did not occur, and this claim is without merit.

Because we conclude the trial court did not commit instructional error, we need not address appellant's claim he was prejudiced by the instructions.

## II. Any presumed error from the instruction to consider with caution appellant's unrecorded inculpatory statements (CALCRIM No. 358) was harmless.

The trial court instructed the jury with CALCRIM No. 358, which pertains to evidence of a defendant's statements. The instruction included the bracketed portion of CALCRIM No. 358, which states: "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded."

Appellant contends it was error to give the bracketed portion of CALCRIM No. 358 because all his inculpatory statements were recorded. He claims the superfluous instruction confused the jurors by leading them to believe that recorded statements are inherently more credible and reliable and should be subject to less scrutiny. He argues this resulted in prejudice because it undercut his defense that his statement to the police admitting he was the shooter was false.

### A.    Background.

The trial court held the jury instruction conference off the record in chambers. Once back on the record, the trial court stated the parties had reviewed and finalized the instructions, and counsel for appellant confirmed he had nothing to put on the record.

### B.    Analysis.

There is no sua sponte duty to give the bracketed portion of CALCRIM No. 358. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189 (*Diaz*).)  It should be given only if requested by the defendant and there is evidence of an inculpatory out-of-court statement made by the defendant. (*Ibid.; People v. Xiong* (2020) 54 Cal.App.5th 1046, 1080.)  In *Diaz,* our high court explained that while "the instruction may be useful to the defense in highlighting for the jury the need for care and caution in evaluating evidence of the defendant's statements," "the defendant may not always want the instruction to be given." (*Diaz*, at p. 1189.)  Therefore, "it is more appropriate to permit defendants to determine whether to request the instruction than to require the trial judge to give it in every case." (*Diaz*, at p. 1192.)

It is unclear from the record whether trial counsel requested the bracketed language or if he acquiesced to it being given without objection.  Appellant contends that if trial counsel either requested the bracketed language or forfeited the claim on appeal, he provided ineffective assistance of counsel.  Respondent notes that appellant's counsel did not object below but does not contend the claim was forfeited.

We need not resolve the issue of forfeiture or appellant's ineffective assistance of counsel claim because any presumed error was harmless.  Depending upon the basis of the claimed error, instructional error is reviewed under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  Under the more stringent *Chapman* standard, which applies to errors of constitutional dimension, reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman*,

*supra*, 386 U.S. at p. 24.) Under the alternative *Watson* standard, which applies to errors of state law, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

We need not decide whether the *Chapman* or *Watson* standard for prejudicial error applies here because the error was harmless under either standard. The evidence establishing appellant's guilt was overwhelming. Appellant was arrested less than four miles from the scene, approximately one hour after the shooting, in a car that matched the description of the car involved in the shooting. Forensic testing revealed cartridge casings at the scene were fired by the firearm found in the car. Appellant's DNA was found on the gun, and a photograph of appellant holding the gun was found on his cell phone. When interviewed by police, appellant initially claimed to have no memory of the shooting, but after being confronted with the evidence and with several ruses, changed his story several times until he admitted to being the shooter. While appellant claimed he shot Mendoza in self-defense, there was no evidence Mendoza was armed or acted aggressively toward appellant, and the testimony of the pathologist established he shot Mendoza in the back.

Moreover, any prejudice flowing from the presumed error was negligible. Neither attorney referenced the bracketed language during closing argument. Even if they had, it is highly unlikely it would have had any impact on the jury. "The purpose of the bracketed language in CALCRIM No. 358 is to aid the jury in evaluating whether the defendant actually made the statement." (*People v. Xiong*, *supra*, 54 Cal.App.5th at p. 1079.) The bracketed language is "concerned with the reliability and credibility of the witness who testifies about the defendant's statements." (*Diaz*, *supra*, 60 Cal.4th at p. 1187.) The language of CALCRIM No. 358 makes this purpose clear, as it instructs the jurors that they "must decide whether the defendant made" such statements, and that it is up to them "to decide how much importance to give to the statement[s]."

(CALCRIM No. 358.) Evaluating the language of CALCRIM No. 358 as a whole, we find it highly unlikely a jury would misinterpret the bracketed language in the manner appellant suggests.

We also note that appellant's prejudice argument is premised on the bracketed language causing the jury to find his admission to being the shooter more credible. However, by this logic, the jury was equally likely to find his other potentially exculpatory recorded statements more credible as well. In closing argument, appellant's counsel argued his culpability was diminished by his use of Xanax. Appellant's statement in his interview that he consumed 11 Xanax "bars" on the day of the shooting and could not remember anything was critical to this defense. Assuming the bracketed language made the jury less likely to scrutinize the validity of his confession, it stands to reason the jury was also less likely to scrutinize his statement detailing his Xanax use and memory loss, mitigating any potential prejudice.

Considering the overwhelming evidence of guilt, the language of CALCRIM No. 358, and the nature of appellant's defenses at trial, we conclude beyond a reasonable doubt that the bracketed language in CALCRIM No. 358 did not contribute to the verdict. Accordingly, any presumed error was harmless.

III. **The record is insufficient to sustain the substantive gang offense and gang enhancement under newly enacted Assembly Bill No. 333. We reverse and remand for further proceedings.**

While this appeal was pending, the Legislature enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1–5), which became effective on January 1, 2022. Assembly Bill No. 333 amended section 186.22 to modify the showing necessary to sustain gang offenses and enhancements. Appellant contends Assembly Bill No. 333 applies retroactively to this case, and that his conviction for the substantive gang offense and findings for gang enhancements must be reversed because the evidence was insufficient under the law as amended.

### A. *Background.*

To support his conclusion that ESB engages in a pattern of criminal activity, the People's gang expert described two predicate offenses. First, he testified that a confirmed member of ESB pled no contest to being a felon in possession of a firearm (§ 29800, subd. (a)(1)) and possession for sale of methamphetamine (Health & Saf. Code, § 11378) based on his actions on September 11, 2015. Second, he testified that a different confirmed member of ESB pled no contest to being a felon in possession of a firearm (§ 29800, subd. (a)) based on his actions on June 29, 2014. He offered no opinion on how the predicate offenses benefitted ESB, and there was no evidence either predicate offense was committed by more than one person.

### B. *We reverse and remand for further proceedings.*

The substantive gang offense (§ 186.22, subd. (a)) and the gang enhancement (§ 186.22, subd. (b)(1)) require the People to prove the existence of a "criminal street gang." To do so, the People must establish a " 'pattern of criminal gang activity' " by proving, among other things, the existence of two or more predicate crimes committed by gang members. (§ 186.22, subd. (e)(1).) As pertinent here, Assembly Bill No. 333 changed this predicate requirement in two ways. First, the People must prove that each predicate offense was committed by three or more gang members; proof of offenses committed by individual gang members is no longer sufficient. (§ 186.22, subd. (f); *People v. Lopez* (2021) 73 Cal.App.5th 327, 344.) Second, the People must prove that the predicate offenses "commonly benefitted a criminal street gang, and the common benefit of the offense is more than reputational." (§ 186.22, subd. (e)(1).)

Respondent concedes Assembly Bill No. 333 applies retroactively to this case. We agree. As we explained in *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1126, Assembly Bill No. 333 "was an ameliorative change in the law that applies retroactively to cases not yet final on appeal" because it "increased the evidentiary burden necessary to prove a gang-related enhancement." Other California Courts of Appeal have reached the

18.

same conclusion. (*People v. Lopez, supra*, 73 Cal.App.5th at p. 344; *People v. Burgos* (2022) 77 Cal.App.5th 550, 563, review granted July 13, 2022, S274100.)

Respondent also concedes appellant's gang offense and enhancements must be reversed because the evidence at trial was insufficient under section 186.22 as amended. Again, we agree. The predicate offenses in this case involved conduct by only one gang member, and the People offered no evidence or expert opinion that the predicates benefitted the gang. Accordingly, we reverse the substantive gang offense and gang enhancements. On remand the People will have the option to retry the reversed offense and enhancements. (*People v. Sek* (2022) 74 Cal.App.5th 657, 669 [" 'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.' "].)

## DISPOSITION

The true finding in counts 1 and 3 regarding the gang enhancement are reversed. The conviction in count 2 is reversed. Appellant's sentence is vacated, and this matter is remanded for further proceedings. The People shall have the option to retry appellant regarding the gang enhancements and the charge of active gang participation in count 2. If the People do not bring appellant to retrial within the time limits of section 1382, subdivision (a)(2), the trial court shall proceed to resentence appellant accordingly. In all other respects, appellant's judgment is affirmed.

LEVY, J.

WE CONCUR:

HILL, P. J.

PEÑA, J.

19.