Filed 2/26/26  P. v. Velazquezhuar CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063616 |
| v. | (Super. Ct. No. 21ZF0016) |
| OMAR VELAZQUEZHUAR, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge. Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Omar Velazquezhuar was convicted of murdering his long-time domestic partner, Dora Rosas. On appeal, he contends the trial court erred by admitting evidence of his prior uncharged crimes, misinstructing the jury on the law, and coercing the jury into reaching a verdict. Finding no grounds for reversal, we affirm the judgment.

## STATEMENT OF FACTS

Velazquezhuar and Rosas lived together for many years and had two children. In late 2020, Rosas kicked Velazquezhuar out of the family apartment because she suspected he was being unfaithful. Unbeknownst to Velazquezhuar, Rosas then began having a romantic relationship with another man.

One night in February 2021, while Rosas was not home, Velazquezhuar went to the family apartment to visit their children, who were young adults at the time. Upon noticing some new items in the apartment, Velazquezhuar became suspicious and asked the children if Rosas was seeing anyone. They said they were not sure and tried to convince Velazquezhuar they had purchased the new items themselves. Suspecting otherwise, Velazquezhuar grabbed a hammer from the balcony and smashed many items in the apartment.

The children were shocked by Velazquezhuar's violent behavior, which left the apartment a mess. As it turned out, though, Velazquezhuar was not finished. Later that night, he used the hammer to smash the windows of Rosas's car while it was parked in a retail parking lot. Velazquezhuar's actions were concerning to Rosas and the children, but they did not call the police because Velazquezhuar offered to pay for the damage and they thought he was just blowing off steam. Four days later, however, Velazquezhuar attacked Rosas and beat her to death with a metal pipe.

The attack occurred on February 26, 2021. That morning, Rosas drove to Irvine and parked her car in front of the home where she worked as a nanny. When she opened her door and started to get out, Velazquezhuar confronted her, pushed her back inside, and began beating her with a two-foot pipe. Rosas honked her horn and yelled for help, but Velazquezhuar entered the car and continued beating her with the pipe. Although Rosas was able to escape momentarily through the passenger door, she fell on the nearby sidewalk and endured more blows there when Velazquezhuar caught up to her. Velazquezhuar did not relent until a neighbor drove his car up on the sidewalk and tried to run him over.

At that point, Velazquezhuar took off running, ditching the pipe and his sweatshirt in the bushes along the way. However, the police soon captured him in the area. Despite receiving extensive medical treatment, Rosas lapsed into a coma and died of blunt force head trauma three weeks after the attack.

When interviewed by the police, Velazquezhuar said he felt angry and humiliated by the fact Rosas was seeing another man. After drinking for three days and using cocaine, he decided to confront Rosas for cheating on him. Velazquezhuar told the police he did not want to kill Rosas; rather, he just wanted to hurt her and then kill himself. He also claimed he did not hit Rosas very hard with the pipe, and if he had really wanted to kill her, he would have shot her with a gun.

Velazquezhuar was charged with special circumstances murder for killing Rosas by means of lying in wait. At trial, he testified he did not know Rosas was seeing another man until the night he trashed the family apartment and smashed Rosas's car windows with the hammer. Prior to then, he had made several attempts to reconcile with Rosas, but she kept

telling him she needed more time to think about it. When he confronted her in her car on the morning of the attack, he only wanted to talk to her. But she did not want to listen and told him to leave. According to Velazquezhuar, "the devil took over" at that point, and he started beating her with the pipe. When asked if he wanted to hurt Rosas, he stated, "I wanted for her to feel what I was feeling," which he described as hurt and betrayed.

As relevant here, the jury was instructed on two theories of first degree murder (lying in wait and premeditation), the lesser included offense of heat of passion voluntary manslaughter, and the special circumstances allegation of lying in wait. In addition, the jury was instructed it could consider any acts of domestic violence Velazquezhuar may have committed before the killing in deciding whether he was guilty of murder.

During its deliberations, the jury asked the trial court several questions about these instructions and initially could not decide whether Velazquezhuar was guilty of murder in the first degree. Ultimately, though, the jury convicted Velazquezhuar of that offense, but found the special circumstances allegation not true. The trial court sentenced Velazquezhuar to 25 years to life in prison for his crime.

## DISCUSSION

Velazquezhuar contends the jury's verdict was tainted by evidentiary and instructional error and the trial court improperly coerced the jury into reaching a decision. For the reasons explained below, we find no basis to disturb the judgment.

### I.

### THE UNCHARGED CRIMES EVIDENCE

Over a defense objection, the trial court allowed the prosecution to introduce evidence of Velazquezhuar's hammer rampage on February 22,

4

2021, four days before he killed Rosas. As explained above, after concluding Rosas was seeing another man, Velazquezhuar not only smashed things at the family apartment that night, but also smashed the windows of Rosas's car.

The trial court admitted this evidence as domestic violence evidence pursuant to Evidence Code section 1109 and, consistent with that statute, instructed the jury it could use the evidence to infer Velazquezhuar had a propensity for domestic violence and was therefore likely to murder Rosas.[1] The court ruled the hammer rampage evidence also was admissible under section 1101, subdivision (b), to show Velazquezhuar had a motive— jealousy—to murder Rosas. In that regard, the court ruled the probative value of the evidence was substantial, and it was not unduly prejudicial within the meaning of section 352.

Velazquezhuar argues the trial court's ruling was erroneous for three reasons. First, his hammer rampage did not constitute domestic violence within the meaning of section 1109. Second, the hammer rampage evidence was not relevant to his motive for killing Rosas. Third, the evidence was more prejudicial than probative. Velazquezhuar contends that, taken together, these errors violated both the Evidence Code and his right to a fair trial. We disagree.

Evidence of a defendant's uncharged misconduct is generally inadmissible to prove his conduct on a specific occasion or his propensity for criminal activity. (§ 1101, subd. (a).) However, such evidence may be admitted to prove some other material fact in the case, such as motive,

_____

[1] Unless noted otherwise, all further statutory references are to the Evidence Code.

5

intent, or absence of mistake. (*Id.*, subd. (b).) An exception to the propensity rule also exists in cases involving domestic violence. Under section 1109, when a defendant is charged with "an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [s]ection 1101, if the evidence is not inadmissible pursuant to [s]ection 352." (*Id.*, subd. (a).)

Section 1109 refers to two definitions of domestic violence, one from the Penal Code and one from the Family Code. Regarding the former, section 1109 states "'[d]omestic violence' has the meaning set forth in [s]ection 13700 of the Penal Code." (*Id.*, subd. (d)(3).) Section 1109 also states domestic violence "has the further meaning as set forth in [s]ection 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (*Id.*, subd. (d)(3).)

Penal Code section 13700's definition of domestic violence is limited to "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subds. (a) & (b).) Because Velazquezhuar did not cause or attempt to cause bodily injury during his hammer rampage and there is no evidence it caused Rosa to fear imminent serious bodily injury to herself or others, the hammer rampage evidence does not fit Penal Code section 13700's definition of domestic violence.

However, when, as here, the conduct in question occurred within five years of the charged offense, Evidence Code section 1109's definition of domestic violence also encompasses the definition set forth in Family Code section 6211, which is broader than the definition in Penal Code section 13700. (Evid. Code, § 1109, subd. (d)(3).) Under Family Code section 6211,

6

domestic violence is defined as "abuse" committed against certain persons, such as a former cohabitant. (*Id.*, subd. (b).) For purposes of that provision, "abuse" encompasses any conduct that "could be enjoined pursuant to [Family Code] [s]ection 6320" (*id.*, § 6203, subd. (a)(4)), including "destroying personal property" or "disturbing the peace of the other party." (*Id.*, § 6320, subd. (a).)

Velazquezhuar does not dispute his hammer rampage constitutes domestic violence under these Family Code provisions. However, he claims Evidence Code section 1109's reference to Family Code section 6211 was simply intended to define the persons against whom domestic violence can be perpetrated, as opposed to expanding the definition of domestic violence itself.

Velazquezhuar rests his argument on *People v. Zavala* (2005) 130 Cal.App.4th 758 (*Zavala*), which looked solely to the definition of domestic violence in Penal Code section 13700 in determining whether stalking constituted domestic violence for purposes of Evidence Code section 1109. (*Zavala*, at pp. 770–771.) As pointed out in *People v. Mani* (2022) 74 Cal.App.5th 343 (*Mani*), however, the trial in *Zavala* occurred before Evidence Code section 1109 was amended to include Family Code section 6211's definition of domestic violence. (*Mani, supra*, at pp. 363–364.) Therefore, *Zavala* has limited utility in interpreting the current version of Evidence Code section 1109. (*Mani*, at pp. 363–364.)

We agree with the *Mani* court that, as currently written, "the plain and unambiguous language of section 1109, subdivision (d)(3), incorporates, in addition to Penal Code section 13700, the Family Code definition of abuse—including the [enjoinable conduct referenced] in Family Code section 6203, subdivision (a)(4)—provided that the events occurred within five years of the charged offense. Thus, encompassed within the

7

meaning of 'offense involving domestic violence' in section 1109 is an offense involving conduct constituting disturbing the peace of the victim," or destroying the victim's personal property. (*Mani, supra,* 74 Cal.App.5th at p. 361; accord, *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143–1144 [distinguishing *Zavala* on the same basis]; cf. *People v. Dallas* (2008) 165 Cal.App.4th 940, 953 [Evidence Code section 1109's reference to Family Code section 6211 incorporates other provisions of the Family Code in determining what constitutes domestic violence for purposes of Evidence Code section 1109].) Accordingly, Velazquezhuar's hammer rampage constitutes domestic violence within the meaning of Evidence Code section 1109 and was admissible under that section, subject to the terms of Evidence Code section 352.

Section 352 empowers trial courts to exclude evidence if its probative value is substantially outweighed by the probability its admission would cause undue prejudice, confusion, or delay. For purposes of this section, prejudice "is not synonymous with 'damaging,' but refers instead to evidence that '"uniquely tends to evoke an emotional bias against [a] defendant"' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) The trial court has broad discretion in deciding whether evidence rises to this level, and its decision will not be disturbed on appeal unless it was arbitrary, capricious, or patently absurd. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

In addition to being relevant to Velazquezhuar's propensity for domestic violence under section 1109, the hammer rampage evidence was also relevant to show Velazquezhuar was motivated by jealousy-fueled hatred, as opposed to heat of passion, when he attacked Rosas. (See *People v. Kaihea* (2021) 70 Cal.App.5th 257, 265 [motive evidence is relevant to refute

8

a claim of heat of passion].) Yet, in terms of prejudice, the evidence was not remote, disputed, or confusing; nor was it any more inflammatory than the evidence regarding the charged offense. Therefore, it was not unduly prejudicial under section 352, and the trial court did not abuse its discretion or violate Velazquezhuar's fair trial rights by allowing the jury to consider it. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 205; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

In a related argument, Velazquezhuar maintains the trial court also erred in instructing the jury it could consider the hammer rampage evidence as proof he had propensity to commit domestic violence and was thus likely to murder Rosas. The argument is based on Velazquezhuar's belief that the hammer rampage does not constitute domestic violence for purposes of section 1109. As we have explained, however, that belief is incorrect. We therefore reject Velazquezhuar's related instructional claim.

II.

THE PROVOCATION THEORY OF SECOND DEGREE MURDER

Velazquezhuar argues that, when considered in conjunction with the jury instructions on heat of passion voluntary manslaughter, the trial court's instructions on the provocation necessary to reduce first degree murder to second degree murder were deficient. We cannot agree.

On appeal, jury instructions should be interpreted "'to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111–1112.) Instructional error will not be found unless it is reasonably likely the jury misunderstood or misapplied the instructions in a manner that violated the defendant's rights. (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.) In making this determination, we consider the record as a whole, including the

specific instructions being challenged, the evidence adduced at trial, and the arguments of counsel. (*People v. Cain* (1995) 10 Cal.4th 1, 36–37; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.) We also "presume jurors can understand and correlate all instructions given." (*People v. Vang* (2009) 171 Cal.App.4th 1120, 1129.)

Velazquezhuar's instructional claim is based on the different mental states that are required to reduce the crime of first degree murder to a lesser offense. As explained in *People v. Jones* (2014) 223 Cal.App.4th 995, 1000–1001, "a subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime. [Citation.] But more is required to reduce malice murder to voluntary manslaughter. For that, an objective test also applies: the provocation must be so great that . . . it 'would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.'"

Consistent with these principles, the trial court instructed the jury pursuant to CALCRIM No. 522, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude the defendant committed a murder, but was provoked, consider the provocation in deciding whether the crime was first- or second-degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

10

Per CALCRIM No. 570, the trial court also instructed the jury, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone . . . in the heat of passion. [¶] The defendant killed someone . . . in the heat of passion if: [¶] One, the defendant was provoked. [¶] Two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment. [¶] And three, the provocation would have caused a person of average disposition to act rashly and without due deliberation; that is, from passion rather than from judgment."

Regarding the crime of voluntary manslaughter, the trial court further instructed: "The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. [¶] In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation, and knowing the same facts, would have reacted from passion rather than from judgment." (See CALCRIM No. 570.)

Velazquezhuar does not dispute CALCRIM No. 570 properly conveyed the objective standard of provocation that applies when deciding whether to reduce a murder to voluntary manslaughter. But he contends CALCRIM No. 522 was flawed because it failed to inform the jury that a different standard, turning on the defendant's subjective state of mind, controls when deciding whether to reduce a first degree premeditated murder to second degree murder. He fears the jury may have conflated the two standards and failed to realize the provocation required to reduce a murder from first to second degree is judged by a subjective standard, regardless of whether it would be sufficient to cause the average person to act from passion under the objective standard.

11

However, the objective standard was not mentioned in CALCRIM No. 522. Rather, it was only mentioned in CALCRIM No. 570, which explained provocation in the context of heat of passion voluntary manslaughter. Although both instructions deal with provocation, it is not reasonably likely the jury imported the objective standard from CALCRIM No. 570 in applying the evidence to CALCRIM No. 522.

In fact, it would be "illogical" to do so because then "there would be no circumstances under which murder could be reduced from first to second degree based on provocation without being further reduced to manslaughter. Yet CALCRIM No. 522 instructed that provocation could reduce the degree of murder. Thus, the jury would not have understood CALCRIM No. 522 to say that the same standard governed provocation as it related to both the elements of first degree murder and the heat of passion theory of voluntary manslaughter." (*People v. Ocegueda* (2023) 92 Cal.App.5th 548, 559; see also *People v. Jones, supra*, 223 Cal.App.4th at pp. 999–1003 [rejecting the argument that CALCRIM Nos. 522 and 570 failed to adequately explain the objective standard of provocation applies only to voluntary manslaughter and not to the degree of murder the defendant committed].)

This conclusion is bolstered by the prosecutor's closing argument, during which she repeatedly explained that an objective standard governs whether provocation or heat of passion is sufficient to reduce a murder to voluntary manslaughter, whereas a subjective standard governs whether those mitigating circumstances are sufficient to reduce a premeditated first degree murder to murder in the second degree. The prosecutor even gave a hypothetical example to illustrate the distinction between these two standards. Under these circumstances, it is not reasonably likely the jury

12

misconstrued the trial court's instructions in a manner that abridged Velazquezhuar's rights.

In arguing otherwise, Velazquezhuar points out that, during its deliberations, the jury asked the trial court questions about second degree murder and heat of passion. Specifically, the jury wanted to know, "If all jurors believe that there is malice, either implied or express, this seems to indicate murder. Is this second-degree murder unless one of the two theories of first-degree murder [is] also satisfied?" The trial court told the jury that is correct.

The jury also asked, "If the jury agrees to first-degree murder, but a juror or jurors also believe there was . . . heat of passion as well, does this automatically downgrade the verdict to voluntary manslaughter? The instructions on voluntary manslaughter . . . appear to imply that."

The trial judge replied, "If the jury is unanimous that the defendant killed in the heat of passion as defined in CALCRIM 570, . . . then a murder, whether it is a first degree or second degree, is reduced to the crime of voluntary manslaughter. I also refer you to [the final paragraph of CALCRIM No. 570] which states, . . . 'The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder.'"

Velazquezhuar asserts the trial court's responses failed to apprise the jury that provocation and heat of passion can not only reduce a murder to voluntary manslaughter, but they can also reduce a first degree murder to second degree murder. However, CALCRIM No. 522 spelled that out very clearly. And since the jury's second question focused on the relationship between heat of passion and voluntary manslaughter, the court properly

13

limited its response to CALCRIM No. 570, the central instruction on those topics. Having been instructed to consider all the instructions together, it is not reasonably likely the jury failed to realize CALCRIM Nos. 522 and 570 set forth different standards for reducing the crime of first degree murder to a lesser offense. We thus reject Velazquezhuar's challenge to those instructions.

## III.

### THE INSTRUCTIONS ON LYING-IN-WAIT FIRST DEGREE MURDER

Velazquezhuar also challenges how the trial court defined the first degree murder theory of lying in wait. In his view, the court's instructions failed to explain the heightened mental state that theory requires, and the court's answer to one of the jury's questions during deliberations compounded the error. Again, we disagree.

As noted above, Velazquezhuar was charged with two theories of first degree murder, premeditation and lying in wait. (Pen. Code, § 189, subd. (a).) Prior to instructing on those theories, the trial court explained to the jury that murder requires malice, either express or implied, and all murders are deemed to be second degree unless the prosecution proves beyond a reasonable doubt the defendant committed murder in the first degree.

Following its instructions on first degree premeditated murder, the trial court turned to the lying-in-wait theory and instructed the jury as follows: "The defendant is guilty of first-degree murder if the People have proved that the defendant murdered by lying in wait or immediately thereafter. [¶] The defendant committed murder by lying in wait if: [¶] One, he concealed his purpose from the person killed. [¶] Two, he waited and watched for an opportunity to act. [¶] And three, then from a position of advantage, he intended to and did make a surprise attack on the person

14

killed. [¶] The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to premeditation and deliberation."

During its deliberations, the jurors sent the trial judge a note asking, "If we satisfy the lying-in-wait aspect of first-degree murder, do we need to find the defendant had express or implied malice to satisfy first-degree murder or is lying in wait sufficient alone?" The judge answered, "To find the defendant guilty of murder, you must find that at the time of the act or acts that caused death, . . . the defendant had either express or implied malice."

Velazquezhuar concedes these instructions were correct, as far as they went. As he did in the trial court, however, he contends the court should have provided the jury further instruction on the mental state required for lying-in-wait murder. Relying on *People v. Brown* (2023) 14 Cal.5th 453 (*Brown*), Velazquezhuar argues the court should have instructed the jury that lying-in-wait murder required proof he possessed a wanton and reckless intent to inflict injury that was likely to cause death while he was lying in wait to kill Rosas.

Although the facts in *Brown* involved the first degree murder theory of murder by poison, the California Supreme Court spoke broadly in that case to the intent required for murder perpetrated by means of poison, lying in wait, and torture. From an historical perspective, the court noted that, "In designating murders carried out by these means as first degree murder, the Legislature intended to require 'something more' than the showing of a malicious or intentional killing required for second degree murder—something equivalent in turpitude to willfulness, deliberation, and premeditation." (*Brown, supra,* 14 Cal.5th at p. 463.)

15

With respect to the lying-in-wait theory, the *Brown* court stated "'it is not sufficient to merely show the elements of waiting, watching and concealment. It must also be shown that the defendant did those physical acts with the intent to take [the] victim unawares and for the purpose of facilitating [the] attack.' [Citations.] We have also established that the defendant must act with a '"wanton and reckless intent to inflict injury likely to cause death"' [citation], and the period of lying in wait must be sufficient to show that the defendant had ""a state of mind equivalent to premeditation or deliberation"" [citation]." (*Brown, supra*, 14 Cal.5th at p. 465.) If these requirements are satisfied, "separate proof of premeditated intent to kill is not required." (*Ibid.*)

In support of these principles, the *Brown* court cited *People v. Laws* (1993) 12 Cal.App.4th 786 (*Laws*), which ruled that "nothing in section 189 requires the lying in wait to have been done with the intent to kill [or] with the intent to injure." (*Id.* at p. 794.) Indeed, *Laws* held: "The act of lying in wait with secret purpose in order to gain advantage and take a victim unawares is particularly repugnant and of aggravated character so as to justify harsher punishment when the lying in wait results in murder, even if the waiting and watching were not done with the intent to kill or injure." (*Id.* at p. 793.)

Our Supreme Court echoed that point in *Brown*. Although the *Brown* court described wanton and reckless intent to inflict injury likely to cause death as a prerequisite for lying-in-wait first degree murder, it recognized a murder committed by means of lying in wait necessarily "involves, by its nature, a mental state more 'cruel and aggravated,'" which puts it on par with premeditated murder. (*Brown, supra*, 14 Cal.5th at pp. 465–466, citing *Laws, supra*, 12 Cal.App.4th at p. 795, among other cases.)

16

We do not read *Brown* as requiring proof the defendant had the wanton and reckless intent to inflict injury likely to cause death during the period of lying in wait, as Velazquezhuar maintains. Rather, the defendant need only possess such intent at the time of the killing.

Nonetheless, the jury here was instructed lying-in-wait first degree murder required proof Velazquezhuar acted with malice and he waited a substantial enough period of time before killing Rosas "to show a state of mind equivalent to premeditation or deliberation." Consistent with *Brown*, this ensured Velazquezhuar could not be convicted of that offense unless he possessed the wanton and reckless intent to inflict injury likely to cause death. Therefore, the trial court was not required to modify its instruction on lying-in-wait first degree murder to include any additional mental requirements. Nor was it required to mention any such requirements in its response to the jury's question about that offense. The instructions given were sufficient to apprise the jury of the legal elements for that offense.

IV.

JURY COERCION CLAIM

Lastly, Velazquezhuar asserts the trial court improperly coerced the verdict by giving the jury a so-called "dynamite" instruction after it signaled it was having difficulty reaching a verdict. We find no error.

Following five days of trial testimony, the jury began its deliberations at 3:00 p.m. on the afternoon of November 14, 2023. About an hour later, the jury informed the trial judge the written instructions it had received pertained to a different case. The judge acknowledged the error and provided the jury with the correct instructions just before the evening recess.

Deliberations resumed the following morning and continued throughout the day until 4:15 p.m., at which time the jury recessed and gave

17

the trial judge a note containing six questions. In addition to the three questions discussed above, the jurors asked several questions about the concept of malice. They also requested and were permitted to inspect the pipe Velazquezhuar used to kill Rosas.

The trial judge responded to the jury's questions the following morning, November 16. After that, the jury requested and received a readback of the testimony of the man who tried to run over Velazquezhuar while he was attacking Rosas on the sidewalk. The jury then resumed its deliberations, but at 4:15 p.m. that afternoon, it sent the judge a note saying, "we cannot reach an agreement on if the defendant is guilty of first degree murder." At that point, the trial court declared a recess and ordered the jurors to return on November 27, after the Thanksgiving holiday. The court and counsel then met to discuss how to respond to the jury's note.

The trial court posited two options. Under option one, the court would ask the jury foreperson to reveal the numerical split of the jury, and then it would decide whether further deliberations would be fruitful, without giving the jury any further instructions. Under option two, the court would either give the jury a "*Moore* instruction," from the case *People v. Moore* (2002) 96 Cal.App.4th 1105 (*Moore*), or it would read the jury CALCRIM No. 3551, which, like a *Moore* instruction, contains suggestions for overcoming difficulty reaching a verdict. The prosecutor requested the *Moore* instruction under option two, and defense counsel requested option one. As between the *Moore* instruction and CALCRIM No. 3551, defense counsel said he preferred CALCRIM No. 3551.

The trial court decided to go with the *Moore* instruction, indicating it believed it was the best option in light of the jury's questions and the fact the jury had only been deliberating for about two days. Accordingly,

18

on the morning of November 27, 2023, the court instructed the jury as follows:

"Sometimes jurors that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more of the counts. Please consider the following suggestions."

"Your goal as jurors should be to reach a fair and impartial verdict if [you are] able to do so based solely on the evidence presented and without regard for the consequences of your verdict, regardless of how long it takes to do so. It is your duty as jurors to carefully consider, weigh, and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberation, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs. You should not hesitate to change a view you once held if [you are] convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong. Fair and effective jury deliberations require a frank and forthright exchange of views.

"As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.

"Both the People and the defendant are entitled to the individual judgment of each juror. As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

19

"May I suggest that since you have not been able to arrive at a verdict using the methods that you have chosen that you consider to change the methods you have been following, at least temporarily, and try new methods. For example, you may wish to consider having different jurors lead the discussions for a period of time or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa. This might enable you to better understand the other's positions.

"By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberations. I merely find you may find it productive or do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"I also suggest you read instructions 200 and 3500. [They] pertain[] to your duties as jurors and make recommendations on how you should deliberate. The integrity of the trial requires all jurors at all times during their deliberations conduct themselves as required by the instructions.

"The decision the jury renders must be based on the facts and the law. You must determine what the facts [*sic*] have been proven from the evidence received in the trial and not from any other source. A fact is something proved by the evidence or stipulation.

"Second, you must apply the law as I stated it to you to the facts as you determine them and this way arrive at a verdict. You must accept and follow the law as I state it to you regardless of whether you agree with the law. If anything concerning the law said by the attorneys or their arguments

20

or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

"Instruction 3500 defines the jury's duty to deliberate. The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the [c]ourt. . . .

"These are the matters this instruction requires you to discuss for the purposes of reaching a verdict. You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments, and suggestions I have made in the instructions now presented to you.

"I hope my comments and suggestions may have some assistance to you. You're ordered to continue deliberations at this time. If you have other questions, concerns, requests or any communications you desire to report to me, please put these in writing on the form my bailiff has provided you with. Have them signed and dated by your foreperson, and then please notify the bailiff."

The jurors received these instructions at about 9:30 a.m. An hour later, the trial court granted the jurors' request to have Velazquezhuar's testimony read back to them. The readback was completed at 2:16 p.m., and at 4:35 p.m. the jury informed the court it had reached a verdict.

It is against this factual backdrop that we assess Velazquezhuar's claim the trial court improperly coerced the jury into reaching a verdict. Our analysis is guided by Penal Code section 1140, which states, "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless . . . at the expiration of such time as the

21

court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

For purposes of this provision, "'The determination whether there is a reasonable probability of agreement rests in the discretion of the trial court. [Citations.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." [Citation.]' [Citation.] The question of coercion is necessarily dependent on the facts and circumstances of each case.'" (*People v. Sandoval* (1992) 4 Cal.4th 155, 195–196.)

Velazquezhuar likens the instruction given here to the one given to the jury in *Allen v. United States* (1896) 164 U.S. 492. That instruction—known as a "'dynamite'" instruction (*Green v. United States* (5th Cir. 1962) 309 F.2d 852, 853)—encouraged the jurors in the minority to consider whether their views were reasonable in light of those expressed by those in the majority, and it advised the jury to consider the case must be decided at some point, whether in the current trial or by retrial. (*Allen v. United States,* at pp. 501–502.) Although the United States Supreme Court ruled the instruction passed federal constitutional muster, the California Supreme Court disapproved it under state law in *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*).

Finding the instruction constituted an impermissible means of blasting a verdict out of a deadlocked jury, *Gainer* held "it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*Gainer,*

*supra,* 19 Cal.3d at p. 852, disapproved on other grounds in *People v. Valdez* (2012) 55 Cal.4th 82, 163.)

Velazquezhuar contends the instruction given here violated the first *Gainer* prohibition by telling the jurors they "should not hesitate to reexamine [their] views." According to Velazquezhuar, this put undue pressure on the minority jurors to consider the reasonableness of their position and acquiesce to the verdict reached by the majority. In fact, however, the instruction made clear each juror had to decide the case for him- or herself, without sacrificing their individual judgment. And although the instruction encouraged debate to help the jurors understand each other's positions, it expressly stated it was not intended to dictate the manner of deliberations. Instead, the instruction encouraged the jury to "do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her view and consider and understand the views of the other jurors." It also told the jurors their verdict had to be fair, impartial, and based solely on the evidence and the law.

Taken together, these admonishments were sufficient to guard against the possibility of undue influence on the minority jurors. The trial court's instructions did not improperly imply the minority jurors should abandon their independent judgment and change their position simply because it was not shared by the majority of the jurors. Accordingly, the instructions did not violate the first prohibition against jury coercion expressed in *Gainer*.

Nor did they violate the second *Gainer* prohibition by improperly suggesting to the jurors a verdict had to be reached at some point, and if they failed to do so, the case would have to be retried before another jury. Indeed, the instruction did not mention anything about the potential for a retrial. As

23

Velazquezhuar correctly observes, it did say the jurors' "goal" was to reach a verdict. But a goal is different than a mandate. The instruction did not cross the line between encouraging the jury to reach a verdict, which is proper, and coercing the jury to do so, which is not. (*People v. Peoples* (2016) 62 Cal.4th 718, 783.)

In fact, Velazquezhuar concedes the instruction was materially indistinguishable from the one approved in *Moore* and other cases. (See *Moore, supra*, 96 Cal.App.4th at pp. 1118–1122 [describing the instruction as "excellent" and finding it was fully compliant with the dictates of *Gainer*]; *People v. Whaley* (2007) 152 Cal.App.4th 968, 982–983 [two-to-one decision rejecting the claim "*Moore* was wrongly decided and should not be followed"]; *People v. Hinton* (2004) 121 Cal.App.4th 655, 661 [describing the *Moore* instruction as "a model for how to instruct the jury following its initial deadlock"].) Contrary to what Velazquezhuar would have us conclude, these cases did not interpret or apply *Gainer* incorrectly. We join them in approving the instruction the trial court gave here.

Velazquezhuar further contends the trial court was remiss for failing to make an appropriate inquiry before giving the challenged instruction. He claims the court should have polled the jurors to find out how they were numerically divided, how many ballots they had taken, which direction the vote was trending, whether they believed further deliberations would be fruitful, and whether they needed any additional information to assist them in reaching a verdict.

However, the trial court has broad discretion in determining how to respond to a jury's reported impasse. Although the measures suggested by Velazquezhuar are authorized by California Rules of Court, rule 2.1036, a trial court does not abuse its discretion merely by failing to utilize them when

24

responding to a jury's impasse. (*People v. Debose* (2014) 59 Cal.4th 177, 210 [trial court need not inquire into the jury's numerical division]; *People v. Peoples, supra,* 62 Cal.4th at p. 782 [trial court need not poll jury as to the likelihood of reaching a unanimous verdict]; *People v. Rojas* (1975) 15 Cal.3d 540, 547 [trial court need not take a "formal vote" of the jury]; *People v. Salazar* (2014) 227 Cal.App.4th 1078, 1088 [trial court has discretion when deciding which tools to use when facing a jury deadlock].)

Moreover, even if the jurors had been polled and reported negatively on the prospects for a unanimous verdict at that time, it still would not have been unreasonable for the trial court to have them continue deliberating. (See *People v. Sandoval, supra*, 4 Cal.4th at pp. 194–197; *People v. Rodriguez* (1986) 42 Cal.3d 730, 765–770.) After all, the jury had only been deliberating for about two days when it reported being deadlocked. That is not a particularly long time for a five-day murder trial that involved two theories of first degree murder, a special circumstance allegation, and the heat of passion theory of voluntary manslaughter.

All things considered, the trial court acted reasonably and fairly under the circumstances presented. The court neither coerced the jury into reaching a verdict by giving the instruction approved in *Moore* nor abused its discretion by failing to take other measures in response to the jury's impasse. We reject Velazquezhuar's claims to the contrary.[2]

---

[2] Having rejected all of Velazquezhuar's individual claims of trial court error, we reject his claim of cumulative error because there is no error to accumulate. (See *People v. Johnson* (2015) 60 Cal.4th 966, 996.)

## DISPOSITION

The judgment is affirmed.


GOODING, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


DELANEY, J.